**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| In the Matter of: SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Debtor*, _____ FIRST SOUTHERN NATIONAL BANK, *Plaintiff-Appellant*, v. SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Defendant-Appellee.* | No. 12-17241 D.C. No. 2:11-cv-02579-HRH |

| | |
|---|---|
| In the Matter of: SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Debtor*, _____ SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Plaintiff-Appellant*, v. FIRST SOUTHERN NATIONAL BANK, *Defendant-Appellee.* | No. 12-17327 D.C. No. 2:11-cv-02579-HRH |

| | |
|---|---|
| In the Matter of: SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Debtor*, ——————————— FIRST SOUTHERN NATIONAL BANK, *Plaintiff-Appellant*, v. SUNNYSLOPE HOUSING LP, *Defendant-Appellee*. | No. 13-16164 D.C. No. 2:12-cv-02700-HRH |
| In the Matter of: SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Debtor*, ——————————— SUNNYSLOPE HOUSING LP, *Plaintiff-Appellant*, v. FIRST SOUTHERN NATIONAL BANK, *Defendant-Appellee*. | No. 13-16180 D.C. No. 2:12-cv-02700-HRH OPINION |

Appeal from the United States District Court
for the District of Arizona
H. Russel Holland, Senior District Judge, Presiding

Argued and Submitted
May 12, 2015—San Francisco, California

Filed April 8, 2016

Before: Alex Kozinski, Richard A. Paez,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Paez

## SUMMARY[*]

### Bankruptcy

Reversing the district court's judgment affirming the bankruptcy court's confirmation of a chapter 11 plan of reorganization, the panel held that the plan was based on an improper valuation of a creditor's secured interest in real property.

The debtor developed and operated an apartment complex intended to provide affordable housing. When the debtor defaulted on the senior loan for the project, the Department of Housing and Urban Development honored its guarantee, acquired the senior loan from the original private lender, and resold it to First Southern National Bank. First Southern started the foreclosure process, which would have wiped out affordable housing restrictive covenants related to additional

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

financing. The debtor then was put into bankruptcy, and it exercised the cram down option of 11 U.S.C. § 1325(a)(5)(B) and elected to retain the property in exchange for a new payment plan that would require it to pay First Southern an amount equal to the present value of the secured claim at the time of bankruptcy.

The panel held that the parties' appeals were not equitably moot even though funding for the reorganization plan had been provided by the investment of new equity by Cornerstone at Camelback, LLC, which had taken over ownership of the debtor, and the plan had been substantially consummated.

The panel held that the value of First Southern's secured interest under 11 U.S.C. § 506(a) should not be reduced by the impact of the affordable housing restrictions because First Southern was released from HUD's requirements, and its claim was superior to the rights of other secured creditors. All of the restrictive covenants that the debtor sought to invoke were derived from positions that were junior and expressly subordinated to First Southern's interest. Distinguishing *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953 (1997), the panel held that the plan of reorganization confirmed by the bankruptcy court must be set aside because valuing First Southern's secured interest as if the affordable housing restrictions related to subordinated positions still applied was not appropriate under § 506(a). The panel reversed the district court's judgment and remanded the case for additional proceedings.

Dissenting, Judge Paez wrote that under *Rash*, First Southern's collateral, the apartment complex, must be valued in light of the debtor's proposed use of the property as

affordable housing.  Accordingly, Judge Paez did not agree with the majority that the bankruptcy court erred in its valuation of First Southern's collateral under § 506(a).

## COUNSEL

Brian Sirower (argued) and Walter J. Ashbrook, Quarles & Brady LLP, Phoenix, Arizona; E. King Poor, Quarles & Brady LLP, Chicago, Illinois, for Plaintiff-Appellant/Cross-Appellee First Southern National Bank.

David William Engelman, Scott B. Cohen, and Bradley D. Pack, Engelman Berger, P.C., Phoenix, Arizona; Susan M. Freeman (argued), Henk Taylor, and Justin Henderson, Lewis Roca Rothgerber Christie LLP, Phoenix, Arizona for Debtor Defendant-Appellee/Cross-Appellant Sunnyslope Housing Limited Partnership.

**OPINION**

CLIFTON, Circuit Judge:

This case concerns the valuation of the secured interest in real property under section 506(a) of the Bankruptcy Code when a bankrupt debtor has exercised the "cram down" option provided under section 1325(a)(5)(B) of the Code.

Debtor Sunnyslope Housing Limited Partnership ("Sunnyslope") developed and operated an apartment complex in Phoenix intended to provide affordable housing. The project was largely financed by government agencies, and restrictions were imposed to require that the apartments would be used for affordable housing. The senior loan was provided by a private entity but was guaranteed by the Department of Housing and Urban Development ("HUD"). Other loans were provided by the City of Phoenix and the State of Arizona, and additional financial support was available through federal tax credits. Restrictions imposed in connection with the additional loans and tax credits provided that the additional financing and the related restrictions were subordinate to the HUD guaranteed loan. Sunnyslope defaulted. HUD honored its guarantee, acquired the senior loan from the original private lender, and resold it to First Southern National Bank ("First Southern"). First Southern started the foreclosure process, which would have the effect of wiping out all the affordable housing restrictions related to the additional financing. Before foreclosure was accomplished, however, Sunnyslope was put into bankruptcy.

As the debtor, Sunnyslope exercised the cram down option and elected to retain the property. It argued that the value of First Southern's secured interest should be calculated

with the affordable housing restrictions remaining in place. The bankruptcy court and the district court both agreed, and a plan of reorganization was confirmed and implemented. The plan valued First Southern's secured interest at $3.9 million, substantially less than what it would cost to replace the property or the amount that First Southern could have obtained if it had been permitted to foreclose on the property.

First Southern appeals. The primary question is whether the value of First Southern's secured interest should be reduced by the impact of the affordable housing restrictions. We conclude that it should not be reduced in that manner. We reverse the judgment of the district court and remand for further proceedings.

## I.   Background

Sunnyslope is an Arizona limited partnership. The project it developed and operated consisted of 150 apartments. Financing came from several sources.

The primary financing was provided by an $8.5 million loan from Capstone Advisors, LLC (the "Capstone Loan"). The federal government, through HUD, guaranteed the Capstone Loan.   The terms of the loan provided for repayment over 40 years with an interest rate of 5.35% per annum. The loan was secured by a first-position deed of trust on the property. To obtain the HUD guaranteed loan, Sunnyslope had to enter into and record a Regulatory Agreement that required that the project be operated as affordable housing and that limited rents that tenants could be charged to amounts within levels set by HUD.

The Capstone Loan was funded by the sale of municipal bonds issued by the Phoenix Industrial Development Authority ("IDA"). The Phoenix IDA required the recording of another agreement that compelled the owner of the apartment project to operate it in accordance with the affordable housing requirements of 26 U.S.C. § 142(d). The IDA Regulatory Agreement provided that the covenants "shall run with the land and shall bind the Owner, and its successors and assigns and all subsequent owners or operators of the Project." It further provided that "[t]his Agreement, and each and all of the terms hereof, shall terminate and be of no further force and effect in the event of a foreclosure of the lien of the Mortgage or delivery of a deed in lieu of foreclosure[.]"

Additional funding for the project came from a $3 million loan from the City of Phoenix, secured by a second-position deed of trust. To obtain that loan, Sunnyslope had to enter into recorded covenants that required the debtor to set aside twenty-three units of the project as affordable housing. The covenants provided that they were binding on successor owners but also that "the provisions hereof are expressly subordinate to the HUD insured mortgage or Deed of Trust, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance . . . regulations and related administrative requirements." They further provided that "[i]n the event of foreclosure or transfer of title by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate."

Another $500,000 in public funding came from the State of Arizona, secured by a third-position deed of trust. It was conditioned on the recording of covenants that set aside an additional five units for low-income renters. Like the City's

provisions, the State covenants were binding upon the owner and any successors to the property, but they similarly provided that "[t]he provisions of this Agreement are expressly subordinate to the Senior Loan, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance . . . regulations and related administrative requirements." They also provided that "[i]n the event of foreclosure or transfer by title of deed in lieu of foreclosure, any and all land use covenants contained in this agreement shall automatically terminate."

Once the apartment project was completed in 2008, Sunnyslope and its equity owners qualified for federal tax credits under the Low Income Housing Tax Credit ("LIHTC") program. The LIHTC program gives investors a monetary incentive to invest in low income housing by providing tax credits rather than traditional cash returns. Those tax credits are made available for the first ten years a project operates as affordable housing. The Sunnyslope apartment project was placed in service in 2008, so there were seven years of tax credits remaining at the time of the bankruptcy proceedings described below, estimated to be worth $539,973 per year. To receive the tax credits, Sunnyslope entered into still another agreement, requiring that all 150 units in the project meet the definition of "low income units" in 26 U.S.C. § 42(i)(3)(A). Like the financing agreements described above, this agreement was binding on future owners but the provisions of the agreement "are expressly subordinate to the HUD insured mortgage or Deed of Trust, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance . . . regulations and related administrative requirements." The agreement further provided that "[i]n the event of foreclosure or transfer of title

by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate."

Unfortunately, the project was not blessed with good timing. It was completed in 2008, the same year that the nation suffered a financial crisis, driven in large part by the bursting of a housing bubble. Housing prices in much of the nation declined substantially, and Phoenix was one of the cities hit hardest. Whether or not that was the cause of distress for this project,[1] by the summer of 2009 Sunnyslope defaulted on the Capstone Loan. HUD took the loan over from Capstone.

In September 2010, HUD sold a package of loans to First Southern. The Capstone Loan was part of the package, and it was sold to First Southern for $5,050,186.24. The loan sale agreement provided that the deed of trust was a valid and enforceable lien on the property, subject to "any applicable bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally" and except for "covenants, conditions and restrictions, rights of way, easements and other matters of public record[.]" As part of the sale, HUD released the HUD Regulatory Agreement.

First Southern, in October 2010, filed a foreclosure complaint against Sunnyslope in state court and moved for the appointment of a receiver. A trustee's sale of the project was noticed. The receiver negotiated an agreement to sell the property, post-foreclosure, for $7,650,000. Before any sale could be completed, however, Sunnyslope's general partner filed a petition for involuntary bankruptcy on January 31,

---

[1] In its brief, Sunnyslope points to "a substantial increase in construction costs and other challenges."

2011. The bankruptcy court later entered an order converting the involuntary bankruptcy to a voluntary Chapter 11 bankruptcy.

Through the bankruptcy proceedings, Sunnyslope sought to retain ownership and control of the property by exercising the so-called "cram down" power under 11 U.S.C. § 1325(a)(5)(B). That power allowed the debtor, Sunnyslope, to keep the property over the objection of the secured creditor, First Southern, in exchange for a new payment plan that would require Sunnyslope to pay First Southern an amount equal to the present value of the secured claim at the time of bankruptcy. The value of the allowed secured claim is governed by 11 U.S.C. § 506(a). *See Associates Commercial Corp. v. Rash*, 520 U.S. 953, 957 (1997). The determination of that value is the primary subject of this appeal.

In its proposed plan of reorganization, Sunnyslope originally asserted that First Southern's secured claim should be valued at $2.5 million. First Southern filed a motion under section 506(a) to determine the amount of its secured claim. First Southern's experts valued the property at about $7.7 million. That value was premised on the release of the affordable housing covenants, because foreclosure would extinguish them. In response, Sunnyslope's expert valued the property without the affordable housing restrictions at $7 million but valued it at $2.6 million if the restrictions still applied. The valuation by Sunnyslope's expert did not include anything for the value of the tax credits. In reply, First Southern offered an additional report from one of its experts opining that with the rent restrictions the property was worth $4.885 million and that the tax credits that could be available

if the project were maintained as affordable housing added an additional $2.91 million for a total value of $7.795 million.

The primary difference in the valuations turned on whether the affordable housing covenants remained in effect to limit the rent that could be collected from the apartments. Sunnyslope argued that they still applied and, as a result, the limit on the amount of rental income that could be realized from the apartments substantially reduced the value of the project. First Southern contended that the restrictions should no longer apply and that the project should be valued accordingly.

The bankruptcy court agreed with Sunnyslope. It concluded that the secured value of the property was $2.6 million, based on continuing application of the covenants, and further concluded that the creditor had no right to the value of the tax credits. The bankruptcy court subsequently confirmed Sunnyslope's plan of reorganization and denied First Southern's motion for a stay of the plan.

That reorganization plan proposed to pay $2.6 million for First Southern's secured claim over 40 years at an interest rate of 4.4 % per annum. The balance of First Southern's claim would be paid as a balloon payment at the end of the 40-year term. Funding for the plan was to be provided by the investment of $1.2 million of new equity by Cornerstone at Camelback, LLC ("Cornerstone"), which would take over ownership of Sunnyslope, and from revenues generated by continued operation of the apartment complex as affordable housing.

First Southern appealed to the district court, challenging both the valuation order and the confirmation order. The

district court ultimately held, in an order entered September 18, 2012, that the valuation was properly limited by the affordable housing restrictions, but that the valuation should have included the value of the tax credits. The matter was remanded to the bankruptcy court for further proceedings. The district court also concluded that the bankruptcy court did not err in denying First Southern's motion for a stay.

First Southern filed a notice of appeal to this court on October 9, 2012, primarily contesting the section 506(a) valuation. Sunnyslope responded by filing a notice of cross-appeal, contesting the inclusion of the tax credits in the section 506(a) valuation. The clerk of this court issued an order requiring the parties to brief whether this court had jurisdiction over the appeal and cross-appeal, as there was no final order from the district court.

After additional proceedings, the bankruptcy court entered a memorandum decision on December 12, 2012, determining that the value of the tax credits was $1.3 million, bringing the secured value of First Southern's lien to $3.9 million. The bankruptcy court subsequently confirmed a modified plan of reorganization based on that valuation. First Southern appealed to the district court and sought a stay. The district court affirmed the bankruptcy court's determinations and declined to grant First Southern a stay. The reorganization plan was thereafter put into effect; Cornerstone provided its new equity funding and took control of Sunnyslope.

First Southern filed a second notice of appeal to this court on June 6, 2013. Sunnyslope again cross-appealed. Sunnyslope moved to dismiss both appeals on the ground of equitable mootness.

## II. Jurisdiction

Although there may have been some question as to this court's jurisdiction following the filing of the first notice of appeal,[2] the district court's later entry of final judgment has eliminated that question. "[T]he rule in this circuit [is] that once a final judgment is entered, an appeal from an order that otherwise would have been interlocutory is then appealable." *In re Rains*, 428 F.3d 893, 901 (9th Cir. 2005) (quoting *In re Eastport Assocs.*, 935 F.2d 1071, 1075 (9th Cir. 1991)). "Whatever prematurity existed in [an appeal from an interlocutory order] was cured by the subsequent entry of a final judgment." *Id.* Thus, we have jurisdiction over the issues in both appeals, and we now consider both appeals together.

## III.     Equitable Mootness

Sunnyslope has moved to dismiss these appeals as equitably moot. "An appeal is equitably moot if the case presents 'transactions that are so complex or difficult to unwind' that 'debtors, creditors, and third parties are entitled to rely on [the] final bankruptcy court order.'" *In re Mortgages Ltd.*, 771 F.3d 1211, 1215 (9th Cir. 2014) (quoting *In re Thorpe Insulation Co.*, 677 F.3d 869, 880 (9th Cir.

---

[2] "Under 28 U.S.C. § 158(a), we have jurisdiction to hear appeals from final judgments, order[s] and decrees entered by a district court on appeal from a bankruptcy court." *In re Fowler*, 394 F.3d 1208, 1211 (9th Cir. 2005) (internal quotation marks omitted). This court may also hear interlocutory appeals based on the flexible finality rule, a judicially created rule unique to bankruptcy. *See id.* (discussing the flexible finality rule). The parties have disagreed about the applicability of that flexible finality rule in these circumstances, but it is no longer necessary for us to resolve that issue.

2012)); *see also In re Transwest Resort Properties, Inc.*, 801 F.3d 1161, 1168–73 (9th Cir. 2015).[3]

Sunnyslope primarily points to the new equity invested by Cornerstone as the reason to dismiss the appeals as moot. Because the investment was made as part of a 26 U.S.C. § 1033 exchange, it contends that Cornerstone and its principals would be subject to tax liabilities of more than $1.5 million including penalties and interest if the plan confirmation order were reversed. It also argues that Cornerstone would be unable to recover a substantial part of the $1.2 million that it invested in Sunnyslope if the plan were unwound.

This court has identified four factors to help determine whether a case should be deemed equitably moot:

> (1) "whether a stay was sought, for absent that a party has not fully pursued its rights"; (2) "if a stay was sought and not gained, [the court] then will look to whether substantial consummation of the plan has occurred"; (3) "[the court] will look to the effect that a remedy may have on third parties not before the court"; (4) "[f]inally, we will look at whether the bankruptcy court can fashion

---

[3] The doctrine of equitable mootness differs from Article III mootness. The latter deals with whether there is an actual, live case or controversy for a court to decide. If there is not, then we lack authority under the Constitution to proceed. In contrast, "equitable mootness" is "a judge-made abstention doctrine" that is based on an unwillingness to alter the outcome of a plan of reorganization in circumstances where it would not be equitable to do so. *In re Mortgages*, 771 F.3d at 1214–15. As it is a prudential doctrine, it does not present a challenge to our jurisdiction.

> effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation before the bankruptcy court."

*Id.* at 1217 (quoting *In re Thorpe Insulation*, 677 F.3d at 881).

Generally, in determining equitable mootness, and in particular with regard to the fourth factor in the analysis, the power to grant equitable relief, we have noted that "[t]he party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide." *In re Focus Media, Inc.*, 378 F.3d 916, 923 (9th Cir. 2004) (quoting *In re Pintlar Corp.*, 124 F.3d 1310, 1312 (9th Cir. 1997)). We conclude that Sunnyslope has not carried that burden.

First Southern applied for a stay in the bankruptcy court and then again in the district court. Those applications were denied. First Southern did not appeal the denial of the stay to this court, asserting that it was misled by Sunnyslope as to the need to do so, but it did file two separate notices of appeal. These made plain its intent to pursue the matter on appeal. We conclude that the failure to seek a stay from this court is not fatal to the current appeal and that First Southern's efforts to obtain a stay from the bankruptcy court and the district court were sufficient to satisfy the first factor. We have previously declined to dismiss appeals based on equitable mootness when, as here, the aggrieved party applied for a stay to the bankruptcy court and appealed to the district court but did not further pursue a stay motion to this court. *See In re Focus Media*, 378 F.3d at 924; *In re Mortgages*, 771 F.3d at

1216; *In re Transwest*, 801 F.3d at 1168. The reality is that this court does not often grant stays in circumstances like these. A secured creditor might be wise to err on the side of caution and seek a stay from this court, but the failure to do so in this case should not, we conclude, mean that these appeals should be dismissed as moot.[4]

As for the second factor, the plan as approved by the bankruptcy court was substantially consummated, as all parties acknowledge. Cornerstone invested the new equity funding and took over Sunnyslope.

The question posed by the third factor is "whether modification of the plan of reorganization would bear unduly on the innocent." *In re Thorpe Insulation*, 677 F.3d at 882; *see In re Transwest*, 801 F.3d at 1169. In our view, the unraveling of the plan would not have a negative effect on parties intended to be protected by the doctrine of equitable mootness, namely innocent third parties not before the court.

The key third party who would be affected by the unraveling of the plan is the new equity investor under the plan, Cornerstone. While not a party before the court in its own name, it is here in the guise of Sunnyslope. Sunnyslope concedes that Cornerstone is now the equity owner of Sunnyslope. More broadly, Cornerstone is not the kind of

---

[4] Sunnyslope contends that the aggrieved party is required to appeal a denial of a stay to this court and thereafter to the Circuit Justice, citing *In re Roberts Farms*, 652 F.2d 793, 798 (9th Cir. 1981). But our later decision in *Focus Media* looked only to see if the party sought a stay from the bankruptcy court and the district court. In *Roberts Farms*, the party did not even seek a stay from the bankruptcy court, so the question of what further steps beyond that had to be taken was not before the court. 652 F.2d at 798.

innocent third party the doctrine of equitable mootness is intended to protect. Cornerstone's principals are sophisticated investors. They decided on their own to obtain funds for this investment via an exchange transaction that posed potential tax risks if something went wrong. Cornerstone was intimately involved in the development of the plan under which they took over Sunnyslope. It knew that the valuation upon which the plan was based was vigorously disputed by First Southern. Cornerstone's primary principal, Mr. Aronson, served as one of Sunnyslope's main witnesses. Cornerstone knew that First Southern had filed notices of appeal. The failure of First Southern to seek a stay from this court could not have given Cornerstone reasonable cause to conclude that First Southern had abandoned its challenge. Cornerstone made a conscious decision to proceed nonetheless. The attempt to characterize Cornerstone as an innocent third party to invoke dismissal of the appeal on the ground of equitable mootness is unconvincing.

Sunnyslope argues that the City of Phoenix and the State of Arizona were also innocent third parties that would be harmed by the unraveling of the plan. But no additional investment was made under the plan by either the City or the State. Nor, as junior secured creditors, are they third parties absent from the proceedings, unable to protect themselves. They have legitimate interests as creditors and as sponsors of affordable housing, but those interests do not support dismissal of the appeal on the ground of equitable mootness.

The fourth factor, whether the bankruptcy court can fashion effective and equitable relief, is generally the most important of the four factors. *In re Thorpe Insulation*, 677 F.3d at 883. But Sunnyslope's objection here is not really that the transactions cannot practically be unwound. The

transactions were not that complex. The argument, rather, is that the unwinding would have a substantial negative impact on Cornerstone. That may be true, but as discussed above, Cornerstone is not the kind of innocent third party the doctrine of equitable mootness is designed to protect.

We deny Sunnyslope's motion to dismiss the appeals as equitably moot.

## IV.     Section 506(a) Valuation

This court reviews de novo a district court's decision on an appeal from a bankruptcy court and thus applies the same standard of review applied by the district court. *In re AFI Holding, Inc.*, 525 F.3d 700, 702 (9th Cir. 2008). No deference is owed to the district court's decision. *Id.* "The bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed de novo." *In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010) (internal quotation marks omitted). This court will "accept the bankruptcy court's findings of fact, unless the court is left with the definite and firm conviction that a mistake has been committed." *Id.* (citation and quotation marks omitted).

The primary question posed here is whether the affordable housing restrictive covenants should affect the valuation of First Southern's secured claim under section 506(a). The facts related to that issue are not seriously in dispute. As noted above, Sunnyslope's own expert, while valuing the secured claim as worth $2.6 million if the covenants still applied, conceded that the value was $7 million if they did not. We conclude, as a matter of law, that the restrictive provisions should not apply to limit the value of First Southern's secured claim.

The starting point is that First Southern as a secured creditor stands in the first position. It obtained the rights of the senior lender from HUD. HUD acquired the Capstone Loan after it fell into default, sold it to First Southern, and released First Southern from the requirements of the HUD Regulatory Agreement. First Southern's secured claim is superior to the rights of other secured creditors.

All of the restrictive covenants and other provisions that Sunnyslope seeks to invoke to limit the project to affordable housing and to the reduced rental income that would be collected as a result are derived from positions that were junior and expressly subordinated to the Capstone Loan. The agreement related to the City of Phoenix loan, for instance, states that "the provisions hereof are expressly subordinate to the HUD insured mortgage or Deed of Trust, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance . . . regulations and related administrative requirements." They further provided that "[i]n the event of foreclosure or transfer of title by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate." If there were a foreclosure sale, there is no doubt that the restrictive provisions would be swept away, giving First Southern's interest a value of at least $7 million.

Due to the bankruptcy proceedings, there has not been a foreclosure sale. But that does not mean that the secured value of First Southern's secured claim may be suppressed by conditions subordinated to its position and attached to loans made by junior creditors.

Section 506 of the Bankruptcy Code provides for the recognition in bankruptcy of the claim of a secured creditor:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).

In *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), the Supreme Court applied this section in the context of a bankruptcy cram down. Rash purchased a tractor truck for use in his freight hauling business. He made a down payment, agreed to pay the remaining amount in 60 monthly installments, and pledged the truck as collateral. The seller assigned the loan and the truck lien to a third party, ACC. Rash and his wife later filed for bankruptcy. At that time the balance owed to ACC on the truck loan was $41,171. *Id.* at 956. The debtor exercised the cram down power under section 1325(a)(5)(B), which allows a debtor to retain the property over the objection of a secured creditor. *Id.* at 957.

The dispute there, as here, concerned the valuation of the creditor's secured claim. The creditor argued that the proper valuation was "the price the Rashes would have to pay to purchase a like vehicle," *id*., estimated to be $41,000. The debtor, in contrast, argued that the proper valuation was "the

net amount ACC would realize upon foreclosure and sale of the collateral," *id*., estimated to be $31,875. The bankruptcy court and the district court agreed with the debtor, and so did the Fifth Circuit sitting en banc, but the Supreme Court did not. The Court held that replacement value was the proper measure in that case.

The Court highlighted a portion of the second sentence of section 506(a) in determining the value of the secured portion of the claim: "Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Id*. at 961. It treated the phrase "proposed disposition or use" of the collateral as identifying two alternatives: "in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor." *Id*. at 962. The Court concluded that a "replacement-value" standard "distinguishes retention from surrender and renders meaningful the key words 'disposition or use.'" *Id*.

In the *Rash* case, as here, the debtor elected to retain the property and use it in his business, over the objection of the secured creditor. Sunnyslope thus argues that *Rash* requires the rejection of the "foreclosure value" and the application of "replacement value" here, which it defines as the value of the property when used for affordable housing. That inference goes astray in two separate ways.

For one, it takes the reference to "use" in *Rash* and in section 506(a) as meaning the particular use to which the debtor elects to devote the property, in Sunnyslope's case as affordable housing. But *Rash* interpreted "use" simply to mean the alternative to "surrender." Rash decided to retain the truck rather than give it up. Nothing in the Court's

decision supports the proposition that the "replacement value" of the property should be measured by the income that can be generated when used in the specific way that the debtor elects to use it. There was no discussion in *Rash* of the income stream that Rash might realize from using the truck in his freight hauling business. Instead, replacement value was variously described as "what the debtor would have to pay for comparable property," *id*. at 955, or "the price the Rashes would have to pay to purchase a like vehicle," *id*. at 957, or "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller," *id*. at 960. The cost to build or buy an apartment complex like Sunnyslope would be much more than the valuation of First Southern's secured claim asserted by Sunnyslope and allowed by the district court.

For another, Sunnyslope fails to appreciate how the facts of this case diverge from the facts in *Rash*. In that case, the "replacement value" was higher than the "foreclosure value." That is usually the case. As *Rash* expressly recognized, the foreclosure value is "typically lower." *Id*. at 960. In our case, however, the foreclosure value is acknowledged to be at least $7 million, because a foreclosure would eliminate the affordable housing restrictions, while the "fair market value" based on an income stream method of valuation that accounts for the affordable housing restrictions is substantially less.

Disregarding "foreclosure value" in favor of an income stream valuation based on the authority of *Rash* ignores what the Court said about the reason for using the replacement value instead:

> When a debtor surrenders the property, a
> creditor obtains it immediately, and is free to

> sell it and reinvest the proceeds. . . . If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use. Adjustments in the interest rate and secured creditor demands for more "adequate protection," 11 U.S.C. § 361, do not fully offset these risks.

*Id*. at 962–63. Applying the replacement value standard—establishing a value higher than the foreclosure value—was deemed by the Court to be more appropriate in light of the double risks that must be borne by the creditor. Sunnyslope's proposed income stream valuation does not account for the double risks. To the contrary, it imposes them on the creditor at the same time that it provides the creditor with a value about one-third of what the creditor could obtain if the property were surrendered.

*Rash* does not support assigning a value to First Southern's secured interest based on a method of valuation that is substantially lower than the replacement cost of the property.  The replacement cost of a like property is the standard that *Rash* commands, and the standard that should have been applied.[5]

---

[5] The dissent argues, at 37–39, that our opinion fails to determine value with regard to the fact that Sunnyslope proposes to use the property as an affordable housing complex. But *Rash* does not authorize the bankruptcy valuation to be based on the income stream that would be derived from the use of property as an affordable housing complex. It holds that "the replacement-value standard accurately gauges the debtor's 'use' of the property." 520 U.S. at 963. Replacement value is a measure of what it

Under section 1325(a)(5) of the Code, a plan's treatment of a secured claim can be confirmed if one of three conditions is satisfied: the creditor accepts the plan, the debtor surrenders the property, or the debtor invokes the cram down power. *Rash*, 520 U.S. at 957. That cram down option permits confirmation of a plan under which the debtor will retain property subject to the creditor's security interest over the objection of the creditor—the plan is "crammed down the throat[] of [an] objecting creditor[ ]." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990). But that option does not authorize shortchanging the creditor with regard to its current secured value. The statute protects the creditor to the extent of that secured value. *Rash*, 520 U.S. at 957. It does not authorize a substantial reduction in the amount of the secured value simply because the bankruptcy process itself means that the creditor cannot actually foreclose on the property.

In this instance, First Southern does not have a secured claim in the full face amount of the note, $8.5 million, because the property was not worth that much at the time of the bankruptcy valuation. First Southern does not contend

---

would cost to produce or acquire an equivalent piece of property, in that instance "the price the Rashes would have to pay to purchase a like tractor." *Id*. at 957.  The seller of the tractor would not be expected to sell it to the Rashes cheaper because the Rashes planned to use it in a way that would not generate much income. Just as the replacement value of a tractor would not take into account the buyer's anticipated use of the tractor, the replacement value of a 150-unit apartment complex does not take into account the fact that there is a restriction on the use of the complex. Thus, contrary to the dissent's assertion, at 40, that we are using a foreclosure method of valuation, we merely conclude that it was erroneous to factor the restrictive covenants into the replacement value of Sunnyslope.

that its secured claim should be valued that highly, but even if it did, its claim would properly be rejected and it could be forced to accept the reduced present value of its secured claim. But the Bankruptcy Code does not authorize the further reduction in First Southern's secured value asserted by Sunnyslope. The "cram down" does not go that far.

Sunnyslope argues that valuing First Southern's secured interest without regard to the affordable housing restrictions will have the negative effect of eliminating the use of the Sunnyslope project for affordable housing. That is likely true, and it is, in an immediate sense, unfortunate. But from a broader perspective, failure to recognize the priority of a senior secured creditor would discourage lenders from making the loans in the first place or would make those loans much more expensive. Future prospective lenders would have to factor in the risk that the value of their secured interest would be substantially diminished. It would, in addition, surely make it much more difficult for HUD to sell defaulted loans on the secondary market and would drastically reduce the amount that HUD could obtain from reselling those loans. Consider what a buyer would pay for HUD's loan to Sunnyslope if it were known that the affordable housing restrictions would remain in place. HUD would either be saddled with more underperforming loans that it could not sell or would salvage substantially less money from defaulted loans, leaving it with substantially less money for future projects.

HUD could have designed the financing in the way that Sunnyslope advocates, by conditioning the sale of the Capstone Loan to First Southern on continued application of the Regulatory Agreement. Instead, it expressly released that agreement. Similarly, the Capstone Loan could have been

made subject to the various affordable housing covenants and restrictions related to the Phoenix IDA financing, the City loan, the State loan, and the tax credits, but that is not how the deal was put together. Those provisions were explicitly subordinated to the Capstone Loan. We cannot disregard the terms of the agreements.

Sunnyslope also complains that First Southern should not benefit from knowingly undertaking what Sunnyslope describes as a "high risk/high reward" transaction, a point echoed in the dissenting opinion, at 37. But the same description could be applied to Sunnyslope's new owners. It is not persuasive for the pot to call the kettle black. There is no reason why Cornerstone should be uniquely immune from the risks that it knowingly undertook.

More importantly, the argument fails to appreciate that First Southern stands in the shoes of the original lender, Capstone or, in practical terms, HUD. Suppose HUD (or Capstone) still owned the loan. As the senior lender, its rights would seem clearly established, and Sunnyslope's argument that the secured value of HUD's position should be reduced because of the affordable housing restrictions, based on junior financing expressly subordinated to HUD's position, would lack force. HUD's position was fully conveyed to First Southern; there is no claim that HUD held anything back for itself. Similarly, there is no claim that First Southern was not a bona fide purchaser of HUD's interest, so there is no basis to treat First Southern as having an interest less than the interest HUD would have.

The value assigned by the bankruptcy court to First Southern's secured interest did not accurately reflect the actual value of that interest.[6]

## V.  Conclusion

Valuing First Southern's secured interest as if the affordable housing restrictions related to subordinated positions still applied was not appropriate under section 506(a). As a result, the plan of reorganization confirmed by the bankruptcy court and affirmed by the district court must be set aside. It was based on an improper valuation of First Southern's interest. We reverse the judgment of the district court and remand for additional proceedings consistent with this opinion.

**REVERSED and REMANDED.**

PAEZ, Circuit Judge, dissenting:

I do not agree with the majority that the bankruptcy court erred in its valuation of First Southern's collateral under 11 U.S.C. § 506(a).  In my view, a straightforward application of the Supreme Court's decision in *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997), compels valuing First Southern's collateral—a 150-unit apartment complex— in light of Sunnyslope's proposed use of the property in its

---

[6] In light of our resolution of this issue, it is not necessary for us to consider other arguments made by the parties, including treatment of the tax credits and the appropriate interest rate on payments owed to First Southern under the plan.

plan of reorganization as affordable housing. I therefore respectfully dissent from the majority's holding that Sunnyslope's proposed use of the property and the attendant restrictive covenants should not affect the value of First Southern's secured claim.[1]

In reversing the bankruptcy court's valuation ruling, the majority errs in several major respects, which all relate to its misapplication of the Supreme Court's decision in *Rash*, the key case in this appeal. Therefore, I begin with a discussion of *Rash* and two lower-court opinions helpful in understanding its holding. I then address the errors that result from the majority's misapplication of *Rash*. In the end, I would affirm the bankruptcy court's order valuing First Southern's collateral at $3.9 million.

## I.

As the majority makes clear, First Southern's secured claim must be valued according to section 506(a), which provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value

---

[1] I agree with the majority that First Southern's appeal is not equitably moot. *See In re Transwest Resort Properties, Inc.*, 801 F.3d 1161, 1168 (9th Cir. 2015).

> shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).

A proper understanding of the Supreme Court's interpretation of section 506(a) in *Rash*, and the majority's erroneous application, begins with our decision in *In re Taffi*, 96 F.3d 1190 (9th Cir. 1996) (en banc). In *Taffi*, the IRS had attached a lien to the Taffis' house to secure payment for a tax liability. *Id.* at 1191. The parties disputed the value of the IRS's secured interest in the house. The Taffis advocated for a foreclosure value—that is, the amount the house would sell for under forced sale conditions. The IRS argued that the claim was worth whatever a willing and informed buyer would pay for the house under market conditions—what this court referred to as the "fair market value." Although the bankruptcy court determined that the foreclosure value should apply, sitting en banc we disagreed. *Id.* at 1191–92.

The en banc court answered the same question we confront here: "what is the appropriate method of valuation prescribed in a reorganization under Chapter 11 where collateral is retained by the debtors for the debtors' use?" *Id.* at 1192. The court answered the question thus:

> When a Chapter 11 debtor or a Chapter 13 debtor intends to retain property subject to a lien, the purpose of a valuation under section 506(a) is not to determine the amount the creditor would receive if it hypothetically had

to foreclose and sell the collateral. Neither the foreclosure value nor the costs of repossession are to be considered because no foreclosure is intended. Instead, when the proposed use of the property is continued retention by the debtor, the purpose of the valuation is to determine how much the creditor will receive for the debtor's continued possession. . . .

In this case, the key fact is that the debtors are going to possess the House. This fact determines the disposition and use of the creditor's interest. The foreclosure value is not relevant because no foreclosure is intended by the Plan. The Taffis are in, not outside of, bankruptcy. The IRS is not foreclosing. Valuation must be accomplished within the actual situation presented. Consequently, the value has to be the fair market value of what the debtors are using.

*Id.* In reversing the bankruptcy court and adopting a fair market value approach—"the price which a willing seller . . . and a willing buyer . . . would agree upon after the property has been exposed to the market for a reasonable time," *id.*—the decision "put this circuit in harmony with all other circuits, except the Fifth, that have considered the question[.]" *Id.* at 1193.

The Fifth Circuit had reached the opposite conclusion in a case decided the same year. In *In re Rash*, 90 F.3d 1036 (5th Cir. 1996) (en banc), the debtor also elected to retain the collateral, a tractor truck, securing the creditor's lien in a

Chapter 13 cramdown.  The creditor argued that the truck's value should be determined based on "what it would cost the debtors to purchase an identical vehicle," that is, its replacement value.  *Id.* at 1038.  Both the bankruptcy court and the Fifth Circuit, sitting en banc, disagreed.  *Id.*

The Fifth Circuit interpreted the text and structure of section 506(a) to militate against replacement value.  The court determined that the first sentence of the statutory text required valuing "the creditor's interest in the estate's interest in" the secured property based on "the value of the collateral *to the creditor*."  *Id.* at 1044.  The court also rejected the creditor's argument that the bankruptcy court contravened the statute's "proposed disposition or use" language in the second sentence by ignoring the Rashes' proposed use of the truck and instead valuing it according to what the creditor would realize in a hypothetical disposition.  *Id.* at 1047.  The court disagreed that just "because the collateral is being retained and used by the debtor, its value is necessarily measured by its worth to the debtor."  *Id.* at 1047–48.  The Fifth Circuit embraced the foreclosure value over a vigorous dissent, which argued that "Section 506(a) is not difficult to interpret. Read as a whole, it plainly means that when a reorganizing debtor retains and uses collateral, we must value the property according to its worth to the debtor (the *actual* user), not to the creditor (a *purely hypothetical* seller)."  *Id.* at 1061 (Smith, J., dissenting).

The Supreme Court reversed.  *Rash*, 520 U.S. at 959. Interpreting section 506(a), the Court held that the truck's value was "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."  *Id.* at 960.  The Court referred to this as the "replacement value," but explained that its use of that term

was consistent with the Ninth Circuit's understanding of the term "fair market value" in *Taffi*: "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Id.* at 959 n.2.

The Court began by expressly rejecting the Fifth Circuit's "starting point"—what the creditor could realize in a foreclosure sale. *Id.* at 960–61. The first sentence of section 506(a) contains no such requirement, the Court concluded. It instructs only that the secured portion of a creditor's claim is limited to the value of the collateral; it says nothing of "*how* that interest is to be valued." *Id.* at 961 (emphasis in original). Instead, the second sentence's "proposed disposition or use" language "is of paramount importance to the valuation question." *Id.* at 962. The Court concluded that the "disposition or use" of the collateral turns on the debtor's alternative choice to surrender collateral or retain and use it pursuant to the cramdown provision, *see* 11 U.S.C. § 1325(a)(5), and that "[a]pplying a foreclosure-value standard when the cram down option is invoked attributes no significance to the different consequences of the debtor's choice . . . ." *Rash*, 520 U.S. at 962. In contrast, using replacement value distinguishes between retention and surrender, "renders meaningful the key words 'disposition or use,'" *id.*, and "accurately gauges the debtor's 'use' of the property . . . in light of the proposed repayment plan reality[.]" *Id.* at 963 (alterations and quotation marks omitted). Thus, the Court interpreted section 506(a) to require valuing property retained by a debtor as "the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'" *Id.* at 965. On the facts presented in *Rash*, the debtor "elected to use the collateral to generate an income stream. That actual use, rather than a foreclosure sale

that will not take place, is the proper guide . . . ." *Id.* at 963; *see also id.* at 964 ("Section 506(a) calls for the value the property possesses in light of the 'disposition or use' in fact 'proposed,' not the various disposition or uses that might have been proposed.").

The Supreme Court's instruction in *Rash* is plain, and its application straightforward. When a debtor retains collateral in a cramdown as in this case, its value turns on the debtor's "actual use" of the collateral as proposed in the reorganization plan, *id.* at 963–64—not on a hypothetical foreclosure value. As a leading treatise explains,

> The import of *Rash* is thus relatively clear: for purposes of determining the amount that must be paid to a secured creditor in the cramdown context, the question of value under section 506(a) turns on the value of the debtor's proposed use of the relevant property under the plan, not the value achievable in a foreclosure scenario that is not proposed. This is the case even though the reorganization may ultimately fail and the creditor may foreclose on its collateral as a result.

2 Alan N. Resnick & Henry J. Sommer, Collier Bankr. Manual ¶ 506.02[6][a] (4th ed. 2015); *see also id.* ¶ 506.02[7][d][I] (applying *Rash* to establish value in Chapter 11 cramdowns where the debtor retains the collateral). That value is measured by what the debtor would pay for a "like asset for the same 'proposed . . . use,'" *Rash*, 520 U.S. at 965, or put differently, by "what a willing buyer in the debtor's

trade, business, or situation would pay to obtain like property[,]" *id.* at 960.

Here, Sunnyslope proposed in the reorganization plan to use the property to provide affordable housing, and in fact that was and remains the only permissible use of the property because of the restrictive covenants—unless and until post-confirmation default and foreclosure. "That actual use, rather than a foreclosure sale that will not take place, is the proper guide . . . ." *Id.* at 963. Because any willing buyer in Sunnyslope's trade or business would take "like" property for the purpose of providing affordable housing and subject to similar restrictive covenants, the collateral's value must be determined in light of the same purpose and burdens. *See Taffi*, 96 F.3d at 1192 ("Valuation must be accomplished within the actual situation presented. Consequently, the value has to be the fair market value of what the debtors are using."). The bankruptcy court therefore did not err in valuing the property as affordable housing.

II.

A.

The foregoing discussion illuminates the majority's errors. Critically, the majority begins from the same erroneous "starting point" as did the Fifth Circuit in its *Rash* en banc opinion, valuing the collateral from the creditor's perspective. Indeed, the majority even borrows the same "starting point" language. *Compare* Maj. Op. 20 ("The starting point is that First Southern as a secured creditor stands in the first position. . . . First Southern's secured claim is superior to the rights of other secured creditors. . . . If there were a foreclosure sale, there is no doubt that the restrictive

provision would be swept away."), *with Rash*, 90 F.3d at 1044 (describing the "logical starting point for valuation" as "what the creditor could realize if it sold the estate's interest in the property according to the security agreement, taking into account the rights of other creditors with liens secured by the estate's interest"), *and Rash*, 90 F.3d at 1051 n.18 (reading section 506(a) to "suggest[] a valuation that starts with what the creditor could realize by repossession and sale of the collateral").

But the Supreme Court expressly rejected starting the valuation from the creditor's perspective. *See Rash*, 520 U.S. at 960–61. Instead, the Court directed valuation from the *debtor's* perspective. *Id.* at 963 ("Of prime significance, the replacement-value standard accurately gauges the debtor's 'use' of the property."); *see also Taffi*, 96 F.3d at 1192. The majority opinion ignores this directive, instead adopting the approach utilized by the Fifth Circuit in its en banc opinion and advocated by Justice Stevens's *dissent* in *Rash*. *See* 520 U.S. at 966 (Stevens., J., dissenting) ("[T]he value should be determined from the creditor's perspective, *i.e.*, what the collateral is worth, on the open market, in the creditor's hands, rather than in the hands of another party.").

## B.

The majority's erroneous focus on First Southern's perspective stems from a concern that the bank got a raw deal in light of its senior position. At the outset of its analysis, the majority recognizes that no foreclosure sale occurred, yet nonetheless concludes, "But that does not mean that the secured value of First Southern's secured claim may be suppressed by conditions subordinated to its position and attached to loans made by junior creditors." Maj. Op. 20.

*Rash* instructs, however, that the priority of First Southern's secured claim with respect to other creditors simply has no place in an analysis that "turns on the value of the debtor's proposed use of the relevant property under the plan." 2 Resnick & Sommer, Collier Bankr. Manual ¶ 506.02[6][a].

In any event, the majority's concern is misplaced. First Southern purchased its interest knowing that covenants restricted the property's use. When the bank purchased the rights of the senior lender from HUD, HUD expressly warranted in the loan sale agreement that First Southern would obtain "a valid and enforceable lien on the related Mortgaged Property having the lien priority indicated on the Mortgage Loan Schedule, *except for* . . . (5) covenants, conditions and restrictions, rights of way, easements and other matters of public record[.]" (emphasis added). Although HUD released First Southern from the Regulatory Agreement, it did not purport to vitiate the other restrictive covenants requiring the property to be used as affordable housing. Those publicly recorded restrictions, which run with the land, arose from agreements subordinate to the loan First Southern purchased and to the HUD Regulatory Agreement, but, in the absence of a foreclosure, still require Sunnyslope and its successors to operate the property as an affordable housing complex. Thus, when First Southern purchased the loan, it did so with knowledge of the restrictions, which likely had already "suppressed" the value of the security interest First Southern purchased: it bought an $8.5 million note for approximately $5 million.

## C.

The majority's two direct attempts to avoid the conclusion required by *Rash* are also unpersuasive. First, the majority

concludes that the reference to "use" in *Rash* means simply the "alternative to 'surrender'" rather than the "particular use to which the debtor elects to devote the property[.]" Maj. Op. 22. Thus, according to the majority, *Rash* does not compel looking to Sunnyslope's particular use of the property as affordable housing. Maj. Op. 22–24 & n.5. This is unpersuasive given the Supreme Court's direction that the collateral must be valued from the debtor's perspective and in light of the "economic benefit for the debtor derived from the collateral." *Rash*, 520 U.S. at 963. Ascertaining an "*accurate*[] gauge of the debtor's 'use' of the property" requires determining present value with regard to how the debtor proposes to use the property—and any restrictions on the debtor's use of the property—rather than focusing simply on the fact the debtor retains ownership. *See id.* (emphasis added). Indeed, in *Rash* the Supreme Court referred to the debtor's use of the collateralized truck not generally but specifically "to generate an income stream" "in the freight-hauling business." *Id.* at 957, 963.

Even if the majority were correct that a section 506(a) valuation looks only to the fact of "use," its methodology still contravenes the Supreme Court's direction that replacement value should measure the cost to obtain *similar* property. *Rash*, 520 U.S. at 955 (describing replacement value as "what the debtor would have to pay for *comparable* property") (emphasis added); *id.* at 957 ("the price the Rashes would have to pay to purchase a *like* vehicle") (emphasis added); *id.* at 960 ("the price a willing buyer in the debtor's trade, business, or situation would pay to obtain *like* property from a willing seller") (emphasis added); *id.* at 965 ("the cost the debtor would incur to obtain a *like* asset for the same 'proposed . . . use'") (emphasis added).

No willing buyer would purchase similar property for a price that does not reflect the restrictive covenants because, as discussed above, those covenants burden how future buyers could use the property.  The most obvious evidence of this is that First Southern paid significantly less for the complex than it would have if the property were not burdened by restrictive covenants.  The majority is correct that the "cost to build or buy an apartment complex like Sunnyslope would be much more than the valuation . . . allowed by the district court," Maj. Op. 23, only if such a complex were not, in fact, *like* the Sunnyslope complex, *i.e.*, a 150-unit complex used to provide affordable housing and restricted to that use by covenants that run with the land.[2]

Second, the majority believes *Rash* should not apply because using the replacement-value standard provides First Southern with only one-third the value it would obtain in a foreclosure sale.  Thus, the majority concludes, using the replacement-value standard here would disserve the policies motivating *Rash*—protecting the creditor from the "double risks" of a cramdown.  Maj. Op. 24.  Although the Supreme Court recognized that foreclosure value is "typically lower" than replacement value, 520 U.S. at 960, it did not direct a different section 506(a) valuation in an atypical situation. Rather, its methodology is derived directly from the text of the statute: using foreclosure value (whether it be higher or

---

[2] For this reason, the analogy the majority draws in footnote five is inapt. Even if a seller were not expected to sell property at a discount based on the buyer's intended use, the seller *would* be expected to accept a discounted purchase price where, as here, the buyer's use of the property is limited by law.  The correct valuation does not turn on any particular projected income stream, but on the fact that the economic benefit from the property is limited by Sunnyslope's proposed use and the restrictive covenants.

lower than replacement value) would render superfluous the terms "disposition or use" and therefore is inappropriate. *Id.* at 962.

Moreover, First Southern and the majority overstate the bank's equities and need for protection. As noted above, First Southern purchased its loan from HUD at a discount price that presumably accounted for the risk of bankruptcy and the property's limitations, both of which are expressly identified in the loan sale agreement. This distinguishes the bank from the "innocent" lender First Southern hypothesizes in its opening brief, that extends a mortgage to a farmer who subsequently grants a conservation easement over the land, depressing its value. First Southern purchased a lien on property *worth* less than its foreclosure value, *for* less than its foreclosure value; it cannot now be heard to complain that the bankruptcy court also valued it at less than foreclosure value.

\*    \*    \*

The majority ignores *Rash*'s directive to value the collateral from the debtor's perspective rather than from the creditor's when the debtor elects to retain it. Unsurprisingly, this erroneous "starting point" leads to an erroneous ending point: although the majority purports to use a "replacement cost," Maj. Op. 24–25, in essence it uses a hypothetical foreclosure method of valuation—assigning to the Sunnyslope complex the same value that would obtain if First Southern foreclosed on the property and swept away the restrictive covenants. As a result, the majority contravenes the Supreme Court, and in doing so all but assures a post-confirmation default that will "have the negative effect of

eliminating the use of the Sunnyslope project for affordable housing," Maj. Op. 26.  I respectfully dissent.[3]

---

[3] As a result of the majority's ruling, Sunnyslope's cross-appeal is moot and the appeal and cross-appeal in No. 13-1614 are also moot.  Under these circumstances, there is no need to address the issues raised in those separate appeals.