OPINION
CLIFTON, Circuit Judge:
This case concerns the valuation of the secured interest in real property under section 506(a) of the Bankruptcy Code when a bankrupt debtor has exercised the “cram down” option provided under section 1129(b) of the Code.
Debtor Sunnyslope Housing Limited Partnership (“Sunnyslope”) developed and operated an apartment complex in Phoenix intended to provide affordable housing. The project was largely financed by government agencies, and restrictions were imposed to require that the apartments would be used for affordable housing. The senior loan was provided by a private entity but was guaranteed by the Department of Housing and Urban Development (“HUD”). Other loans were provided by the City of Phoenix and the State of Arizona, and additional financial support was available through federal tax credits. Restrictions imposed in connection with the additional loans and tax credits provided that the additional financing and the related restrictions were subordinate to the HUD guaranteed loan. Sunnyslope defaulted. HUD honored its guarantee, acquired the senior loan from the original private lender, and resold it to First Southern National Bank (“First Southern”). First Southern started the foreclosure process, which would have the effect of. wiping out all the affordable housing restrictions related to the additional financing. Before foreclosure was accomplished, however, Sunnyslope was put into bankruptcy.
As the debtor, Sunnyslope exercised the cram down option and elected to retain the property. It argued that the value of First Southern’s secured interest should be calculated with the affordable housing restrictions remaining in place. The bankruptcy court and the district court both agreed, and a plan of reorganization was confirmed and implemented. The plan valued First Southern’s secured interest at $3.9 million, substantially less than what it would cost to replace the property or the *940 amount that First Southern could have obtained if it had been permitted to foreclose on the property.
First Southern appeals. The primary question is whether the value of First Southern’s secured interest should be reduced by the impact of the affordable housing restrictions. We conclude that it should not be reduced in that manner. We reverse the judgment of the district court and remand for further proceedings.
I. Background
Sunnyslope is an Arizona limited partnership. The project it developed and operated consisted of 150 apartments. Financing came from several sources.
The primary financing was provided by an $8.5 million loan from. Capstone Advis-ors, LLC (the “Capstone Loan”). The federal government, through HUD, guaranteed the Capstone Loan. The terms of the loan provided for repayment over 40 years with an interest rate of 5.35% per annum. The loan was secured by a first-position deed of trust on the property. To obtain the HUD guaranteed loan, Sunnyslope had to enter into and record a Regulatory Agreement that required that the project be operated as affordable housing and that limited rents that tenants could be charged to amounts within levels set by HUD.
The Capstone Loan was funded by the sale of municipal bonds issued by the Phoenix Industrial Development Authority (“IDA”). The Phoenix IDA required the recording of another agreement that compelled the owner of the apartment project to operate it in accordance with the affordable housing requirements of 26 U.S.C. § 142(d). The IDA Regulatory Agreement provided that the covenants “shall run with the land and shall bind the Owner, and its successors and assigns and all subsequent owners or operators of the Project.” It further provided that “[t]his Agreement, and each and all of the terms hereof, shall terminate and be of no further force and effect in the event of a foreclosure of the lien of the Mortgage or delivery of a deed in lieu of foreclosure^]”
Additional funding for the project came from a $3 million loan from the City of Phoenix, secured by a second-position deed of trust. To obtain that loan, Sunnyslope had to enter into recorded covenants that required the debtor to set aside twenty-three units of the project as affordable housing. The covenants provided that they were binding on successor owners but also that “the provisions hereof are expressly subordinate to the HUD insured mortgage or Deed of Trust, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance ... regulations and related administrative requirements.” They further provided that “[i]n the event of foreclosure or transfer of title by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate.”
Another $500,000 in public funding came from the State of Arizona, secured by a third-position deed of trust. It was conditioned on the recording of covenants that set aside an additional five units for low-income renters. Like the City’s provisions, the State covenants were binding upon the owner and any successors to the property, but they similarly provided that “[t]he provisions of this Agreement are expressly subordinate to the Senior Loan, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance ... regulations and related administrative requirements.” They also provided that “[i]n the event of foreclosure or transfer by title of deed in lieu of foreclosure, any and all land use covenants contained in this agreement shall automatically terminate.”
Once the apartment project was completed in 2008, Sunnyslope and its equity *941 owners qualified for federal .tax credits under the Low Income Housing Tax Credit (“LIHTC”) program. The LIHTC program gives investors a monetary incentive to invest in low income housing by providing tax credits rather than traditional cash returns. Those tax credits are made available for the first ten years a project operates as affordable housing. The Sun-nyslope apartment project was placed in service in 2008, so there were seven years of tax credits remaining at the time of the bankruptcy proceedings described below, estimated to be worth $539,973 per year. To receive the tax credits, Sunnyslope entered into still another agreement, requiring that all 150 units in the project meet the definition of “low income units” in 26 U.S.C. § 42(i)(3)(A). Like the financing agreements described above, this agreement was binding on future owners but the provisions of the agreement “are expressly subordinate to the HUD insured mortgage or Deed of Trust, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance ... regulations and related administrative requirements.” The agreement further provided that “[i]n the event of foreclosure or transfer of title by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate.”
Unfortunately, the project was not blessed with good timing. It was completed in 2008, the same year that the nation suffered a financial crisis, driven in large part by the bursting of a housing bubble. Housing prices in much of the nation declined substantially, and Phoenix was one of the cities hit hardest. Whether or not that was the cause of distress for this project,[1] by the summer of 2009 Sunnys-lope defaulted on the Capstone Loan. HUD took the loan over from Capstone.
In September 2010, HUD sold a package of loans to First Southern. The Capstone Loan was part of the package, and it was sold to First Southern for $5,050,186.24. The loan sale agreement provided that the deed of trust was a valid and enforceable lien on the property, subject to “any applicable bankruptcy, insolvency, reorganization and other laws affecting creditors’ rights generally” and except for “covenants, conditions and restrictions, rights of way, easements and other matters of public record[.]” As part of the sale, HUD released the HUD Regulatory Agreement.
First Southern, in October 2010, filed a foreclosure complaint against Sunnyslope in state court and moved for the appointment of a receiver. A trustee’s sale of the project was noticed. The receiver negotiated an agreement to sell the property, post-foreclosure, for $7,650,000. Before any sale could be completed, however, Sunnyslope’s general partner filed a petition for involuntary bankruptcy on January 31, 2011. The bankruptcy court later entered an order converting the involuntary bankruptcy to a voluntary Chapter 11 bankruptcy.
Through the bankruptcy proceedings, Sunnyslope sought to retain ownership and control of the property by exercising the so-called “cram down” power under 11 U.S.C. § 1129(b). That power allowed the debtor, Sunnyslope, to keep the property over the objection of the secured creditor, First Southern, in exchange for a new payment plan that would require Sunnys-lope to pay First Southern an amount equal to the present value of the secured claim at the time of bankruptcy. The val *942 ue of the allowed secured claim is governed by 11 U.S.C. § 506(a). See Associates Commercial Corp. v. Rash, 520 U.S. 953, 957, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). The determination of that value is the primary subject of this appeal.
In its proposed plan of reorganization, Sunnyslope originally asserted that First Southern’s secured claim should be valued at $2.5 million. First Southern filed a motion under section 506(a) to determine the amount of its secured claim. First Southern’s experts valued the property at about $7.7 million. That value was premised on the release of the affordable housing covenants, because foreclosure would extinguish them. In response, Sunnys-lope’s expert valued the property without the affordable housing restrictions at $7 million but valued it at $2.6 million if the restrictions still applied. The valuation by Sunnyslope’s expert did not include anything for the value of the tax credits. In reply, First Southern offered an additional report from one of its experts opining that with the rent restrictions the property was worth $4,885 million and that the tax credits that could be available if the project were maintained as affordable housing added an additional $2.91 million for a total value of $7,795 million.
The primary difference in the valuations turned on whether the affordable housing covenants remained in effect to limit the rent that could be collected from the apartments. Sunnyslope argued that they still applied and, as a result, the limit on the amount of rental income that could be realized from the apartments substantially reduced the value of the project. First Southern contended that the restrictions should no longer apply and that the project should be valued accordingly.
The bankruptcy court agreed with Sun-nyslope. It concluded that the secured value of the property was $2.6 million, based on continuing application of the covenants, and further concluded that the creditor had no right to the value of the tax credits. The bankruptcy court subsequently confirmed Sunnyslope’s plan of reorganization and denied First Southern’s motion for a stay of the plan.
That reorganization plan proposed to pay $2.6 million for First Southern’s secured claim over 40 years at an interest rate of 4.4% per annum. The balance of First Southern’s claim would be paid as a balloon payment at the end of the 40-year term. Funding for the plan was to be provided by the investment of $1.2 million of new equity by Cornerstone at Camel-back, LLC (“Cornerstone”), which would take over ownership of Sunnyslope, and from revenues generated by continued operation of the apartment complex as affordable housing.
First Southern appealed to the district court, challenging both the valuation order and the confirmation order. The district court ultimately held, in an order entered September 18, 2012, that the valuation was properly limited by the affordable housing restrictions, but that the valuation should have included the value of the tax credits. The matter was remanded to the bankruptcy court for further proceedings. The district court also concluded that the bankruptcy court did not err in denying First Southern’s motion for a stay.
First Southern filed a notice of appeal to this court on October 9, 2012, primarily contesting the section 506(a) valuation. Sunnyslope responded by filing a notice of cross-appeal, contesting the inclusion of the tax credits in the section 506(a) valuation. The clerk of this court issued an order requiring the parties to brief whether this court had jurisdiction over the appeal and cross-appeal, as there was no final order from the district court.
After additional proceedings, the bankruptcy court entered a memorandum deci *943 sion on December 12, 2012, determining that the value of the tax credits was $1.3 million, bringing the secured value of First Southern’s lien to $3.9 million. The bankruptcy court subsequently confirmed a modified plan of reorganization based on that valuation. First Southern appealed to the district court and sought a stay. The district court affirmed the bankruptcy court’s determinations and declined to grant First Southern a stay. The reorganization plan was thereafter put into effect; Cornerstone provided its new equity funding and took control of Sunnyslope.
First Southern filed a second notice of appeal to this court on June 6, 2013. Sun-nyslope again cross-appealed. Sunnyslope moved to dismiss both appeals on the ground of equitable mootness.
II. Jurisdiction
Although there may have been some question as to this court’s jurisdiction following the filing of the first notice of appeal,[2] the district court’s later entry of final judgment has eliminated that question. “[T]he rule in this circuit [is] that once a final judgment is entered, an appeal from an order that otherwise would have been interlocutory is then appealable.” In re Rains, 428 F.3d 893, 901 (9th Cir.2005) (quoting In re Eastport Assocs., 935 F.2d 1071,1075 (9th Cir.1991)). “Whatever prematurity existed in [an appeal from an interlocutory order] was cured by the subsequent entry of a final judgment.” Id. Thus, we have jurisdiction over the issues in both appeals, and we now consider both appeals together.
III. Equitable Mootnéss
Sunnyslope has moved to dismiss these appeals as equitably moot. “An appeal is equitably moot if the case presents ‘transactions that are so complex or difficult to unwind’ that ‘debtors, creditors, and third parties are entitled to rely on [the] final bankruptcy court order.’” In re Mortgages Ltd., 771 F.3d 1211, 1215 (9th Cir.2014) (quoting In re Thorpe Insulation Co., 677 F.3d 869, 880 (9th Cir.2012)); see also In re Transwest Resort Properties, Inc., 801 F,3d 1161, 1168-73 (9th Cir. 2015).[3]
Sunnyslope primarily points to the new equity invested by Cornerstone as the reason to dismiss the appeals as moot. Because the investment was made as part of a 26 U.S.C. § 1033 exchange, it contends that Cornerstone and its principals would be subject to tax liabilities of more than $1.5 million including penalties and interest if the plan confirmation order were reversed. It also argues that Cornerstone would be unable to recover a substantial part of the $1.2 million that it invested in Sunnyslope if the plan were unwound.
*944 This court has identified four factors to help determine whether a case should be deemed equitably moot:
(1) “whether a stay was sought, for absent that a party has not fully pursued its rights”; (2) “if a stay was sought and not gained, [the court] then will look to whether substantial consummation of the plan has occurred”; (3) “[the court] will look to the effect that a remedy may have on third parties not before the court”; (4) “[fjinally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation before the bankruptcy court.”
Id. at 1217 (quoting In re Thorpe Insulation, 677 F.3d at 881).
Generally, in determining equitable mootness, and in particular with regard to the fourth factor in the analysis, the power to grant equitable relief, we have noted that “[t]he party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide.” In re Focus Media, Inc., 378 F.3d 916, 923 (9th Cir.2004) (quoting In re Pintlar Corp., 124 F.3d 1310, 1312 (9th Cir.1997)). We conclude that Sunnyslope has not carried that burden.
First Southern applied for a stay in the bankruptcy court and then again in the district court. Those applications were denied. First Southern did not appeal the denial of the stay to this court, asserting that it was misled by Sunnyslope as to the need to do so, but it did file two separate notices of appeal. These made plain its intent to pursue the matter on appeal. We conclude that the failure to seek a stay from this court is not fatal to the current appeal and that First Southern’s efforts to obtain a stay from the bankruptcy court and the district court were sufficient to satisfy the first factor. We have previously declined to dismiss appeals based on equitable mootness when, as here, the aggrieved party applied for a stay to the bankruptcy court and appealed to the district court but did not further pursue a stay motion to this court. See In re Focus Media, 378 F.3d at 924; In re Mortgages, 771 F.3d at 1216; In re Transwest, 801 F.3d at 1168. The reality is that this court does not often grant stays in circumstances like these. A secured creditor might be wise to err on the side of caution and seek a stay from this court, but the failure to do so in this case should not, we conclude, mean that these appeals should be dismissed as moot.[4]
As for the second factor, the plan as approved by the bankruptcy court was substantially consummated, as all parties acknowledge. Cornerstone invested the new equity funding and took over Sunnys-lope.
The question posed by the third factor is “whether modification of the plan of reorganization would bear unduly on the innocent.” In re Thorpe Insulation, 677 F.3d at 882; see In re Transwest, 801 F.3d at 1169. In our view, the unraveling of the plan would not have a negative effect on parties intended to be protected by the doctrine of equitable mootness, namely innocent third parties not before the court.
The key third party who would be affected by the unraveling of the plan is the *945 new equity investor under .the plan, Cornerstone. While not a party before the court in its own name, it is here in the guise of Sunnyslope. Sunnyslope concedes that Cornerstone is now the equity owner of Sunnyslope. More broadly, Cornerstone is not the kind of innocent third party the doctrine of equitable mootness is intended to protect. Cornerstone’s principals are sophisticated investors. They decided on their own to obtain funds for this investment via an exchange transaction that posed potential tax risks if something went wrong. Cornerstone was intimately involved in the development of the plan under which they took over Sunnyslope. It knew that the valuation upon which the plan was based was vigorously disputed by First Southern. Cornerstone’s primary principal, Mr. Aronson, served as one of Sunnyslope’s main witnesses. Cornerstone knew that First Southern had filed notices of appeal. The failure of First Southern to seek a stay from this court could not have given Cornerstone reasonable cause to conclude that First Southern had abandoned its challenge. Cornerstone made a conscious decision to proceed nonetheless. The attempt to characterize Cornerstone as an innocent third party to invoke dismissal of the appeal on the ground of equitable mootness is unconvincing.
■ Sunnyslope argues that the City of Phoenix and the State of Arizona were also innocent third parties that would be harmed by the unraveling of the plan. But no additional investment was made under the plan by either the City or the State. Nor, as junior secured creditors, are they third parties absent from the proceedings, unable to protect themselves. They have legitimate interests as creditors and as sponsors of affordable housing, but those interests do not support dismissal of the appeal on the ground of equitable mootness. The fourth .factor, whether the bankruptcy court can fashion effective and equitable relief, is generally the most important of the four factors. In re Thorpe Insulation, 677 F.3d at 883. But Sunnys-lope’s objection here is not really that the transactions cannot practically be unwound. The transactions were not that complex. ■ The argument, rather, is that the unwinding would have a substantial negative impact on Cornerstone. That may be true, but as discussed above, Cornerstone is not the kind of innocent third party the doctrine of equitable mootness is designed to protect.
We deny Sunnyslope’s motion to dismiss the appeals as equitably moot.
IV. Section 506(a) Valuation
This court reviews de novo a district court’s decision on an appeal from a bankruptcy court and thus applies the same standard of review applied by the district court. In re AFI Holding, Inc., 525 F.3d 700, 702 (9th Cir.2008). No deference is owed to the district court’s decision. Id. “The bankruptcy court’s findings of fact are reviewed for clear error, while its conclusions of law are reviewed de novo.” In re JTS Corp., 617 F.3d 1102, 1109 (9th Cir.2010) (internal quotation marks omitted). This court will “accept the bankruptcy court’s findings of fact, unless the court is left with the definite and firm conviction that a mistake has been committed.” Id. (citation and quotation marks omitted).
The primary question posed here is whether the affordable housing restrictive covenants should affect the valuation of First Southern’s secured claim under section 506(a). The facts related to that issue are not seriously in dispute. As noted above, Sunnyslope’s own expert, while valuing the secured claim as worth $2.6 million if the covenants still applied, *946 conceded that the value was $7 million if they did not. We conclude, as a matter of law, that the restrictive provisions should not apply to limit the value of First Southern’s secured claim.
The starting point is that First Southern as a secured creditor stands in the first position. It obtained the rights of the senior lender from HUD. HUD acquired the Capstone Loan after it fell into default, sold it to First Southern, and released First Southern from the requirements of the HUD Regulatory Agreement. First Southern’s secured claim is superior to the rights of other secured creditors.
All of the restrictive covenants and other provisions that Sunnyslope seeks to invoke to limit the project to affordable housing and to the reduced rental income that would be collected as a result are derived from positions that were junior and expressly subordinated to the Capstone Loan. The agreement related to the City of Phoenix loan, for instance, states that “the provisions hereof are expressly subordinate to the HUD insured mortgage or Deed of Trust, to the HUD Regulatory Agreement, and subordinate to all applicable HUD mortgage insurance ... regulations and related administrative requirements.” They further provided that “[i]n the event of foreclosure or transfer of title by deed in lieu of foreclosure, any and all land use covenants contained herein shall automatically terminate.” If there were a foreclosure sale, there is no doubt that the restrictive provisions would be swept away, giving First Southern’s interest a value of at least $7 million.
Due to the bankruptcy proceedings, there has not been a foreclosure sale. But that does not mean that the secured value of First Southern’s secured claim may be suppressed by conditions subordinated to its position and attached to loans made by junior creditors.
Section 506 of the Bankruptcy Code provides for the recognition in bankruptcy of the claim of a secured creditor:
An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor’s interest in the estate’s interest in such property, ... and is an unsecured claim to the extent that the value of such creditor’s interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor’s interest.
11 U.S.C. § 506(a)(1).
In Associates Commercial Corp. v. Rash, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), the Supreme Court applied this section in the context of a bankruptcy cram down. Rash purchased a tractor truck for use in his freight hauling business. He made a down payment, agreed to pay the remaining amount in 60 monthly installments, and pledged the truck as collateral. The seller assigned the loan and the truck lien to a third party, ACC. Rash and his wife later filed for bankruptcy. At that time the balance owed to ACC on the truck loan was $41,171. Id, at 956, 117 S.Ct. 1879. The debtor exercised the cram down power under section 1325(a)(5)(B), which allows a debtor, to retain the property over the objection of a secured creditor. Id. at 957, 117 S.Ct. 1879.
The dispute there, as here, concerned the valuation of the creditor’s secured claim. The creditor argued that the proper valuation was “the price the Rashes would have to pay to purchase a like vehicle,” id., estimated to be $41,000. The debtor, in contrast, argued that the proper *947 valuation was “the net amount ACC would realize upon foreclosure and sale of the collateral,” id,., estimated to be $31,875. The bankruptcy court and the district court agreed with the debtor, and so did the Fifth Circuit sitting en banc, but the Supreme Court did not. The Court held that replacement value was the proper measure in that case.
The Court highlighted a portion of the second sentence of section 506(a) in determining the value of the secured portion of the claim: “Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.” Id, at 961, 117 S.Ct. 1879. It treated the phrase “proposed disposition or use” of the collateral as identifying two alternatives: “in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor.” Id. at 962, 117 S.Ct. 1879. The Court concluded that a “replacement-value” standard “distinguishes retention from surrender and renders meaningful the key words ‘disposition or use.’” Id.
In the Rash case, as here, the debtor elected to retain the property and use it in his business, over the objection of the secured creditor. Sunnyslope thus argues that Rash requires the rejection of the “foreclosure value” and the application of “replacement value” here, which it defines as the value of the property when used for affordable housing. That inference goes astray in two separate ways.
For one, it takes the reference to “use” in Rash and in section 506(a) as meaning the particular use to which the debtor elects to devote the property, in Sunnys-lope’s case as affordable housing. But Rash interpreted “use” simply to mean the alternative to “surrender.” Rash decided to retain the truck rather than give it up. Nothing in the Court’s decision supports the proposition that the “replacement value” of the property should be measured by the income that can be generated when used in the specific way that the debtor elects to use it. There was no discussion in Rash of the income stream that Rash might realize from using the truck in his freight hauling business. Instead, replacement value was variously described as “what the debtor would have to pay for comparable property,” id. at 955,117 S.Ct. 1879, or “the price the Rashes would have to pay to purchase a like vehicle,” id. at 957, 117 S.Ct. 1879, or “the price a willing buyer in the debtor’s trade, business, or situation would pay to obtain like property from a willing seller,” id. at 960, 117 S.Ct. 1879. The cost to build or buy an apartment complex like Sunnyslope would be much more than the valuation of First Southern’s secured claim asserted by Sun-nyslope and allowed by the district court.
For another, Sunnyslope fails to appreciate how the facts of this case diverge from the facts in Rash. In that case, the “replacement value” was higher than the “foreclosure value.” That is usually the case. As Rash expressly recognized, the foreclosure value is “typically lower.” Id. at 960, 117 S.Ct. 1879. In our case, however, the foreclosure value is acknowledged to be at least $7 million, because a foreclosure would eliminate the affordable housing restrictions, while the “fair market value” based on an income stream method of valuation that accounts for the affordable housing restrictions is substantially less.
Disregarding “foreclosure value” in favor of an income stream valuation based on the authority of Rash ignores what the Court said about the reason for using the replacement value instead:
When a debtor surrenders the property, a creditor obtains it immediately, and is free to sell it and reinvest the proceeds .... If a debtor keeps the proper *948 ty and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use. Adjustments in the interest,rate and secured creditor demands for more “adequate protection,” 11 U.S.C. § 361, do not fully offset these risks.
Id. at 962-63, 117 S.Ct. 1879. Applying the replacement value standard — establishing a value higher than the foreclosure value — was deemed by the Court to be more appropriate in light of the double risks that must be borne by the creditor. Sunnyslope’s proposed income stream valuation does not account for the double risks. To the contrary, it imposes them on the creditor at the same time that it provides the creditor with a value about one-third of what the creditor could obtain if the property were surrendered.
Rash does not support assigning a value to First Southern’s secured interest based on a method of valuation that is substantially lower than the replacement .cost of the property. The replacement cost of a like property is the standard that Rash commands, and the standard that should have been applied.[5]
Under section 1129(b) of the Code, a plan can be confirmed even without the consent of all impaired classes of creditors if the debtor invokes the cram down power. That cram down option permits confirmation of a plan under which the debtor will retain property subject to the creditor’s security interest over the objection of the creditor — the plan is “crammed down the throat[ ] of [an] objecting creditor[ ].” Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1359 (7th Cir.1990). But that option does not authorize shortchanging the creditor with regard to its current secured value. The statute protects the creditor to the extent of that secured value. Rash, 520 U.S. at 957, 117 S.Ct. 1879. It does not authorize a substantial reduction in the amount of the secured value simply because the bankruptcy process itself means that the creditor cannot actually foreclose on the property.
In this instance, First Southern does not have a secured claim in the full face amount of the note, $8.5 million, because the property was not worth that much at the time of the bankruptcy valuation. First Southern does not contend that its secured claim should be valued that highly, but even if it did, its claim would properly be rejected and it could be forced to accept the reduced present value of its secured claim. But the Bankruptcy Code does not authorize the further reduction in First Southern’s secured value asserted by Sun- *949 nyslope. The “cram down” does not go that far.
Sunnyslope argues that valuing First Southern’s secured interest without regard to the affordable housing restrictions will have the negative effect of eliminating the use of the Sunnyslope project for affordable housing. That is likely true, and it is, in an immediate sense, unfortunate. But from a broader perspective, failure to recognize the priority of a senior secured creditor would discourage lenders from making the loans in the first place or would make those loans much more expensive. Future prospective lenders would have to factor in the risk that the value of their secured interest would be substantially diminished. It would, in addition, surely make it much more difficult for HUD to sell defaulted loans on the secondary market and would drastically reduce the amount that HUD could obtain from reselling those loans. Consider what a buyer would pay for HUD’s loan to Sun-nyslope if it were known that the affordable housing restrictions would remain in place. HUD would either be saddled with more underperforming loans that it could not sell or would salvage substantially less money from defaulted loans, leaving it with substantially less money for future projects.
HUD could have designed the financing in the way that Sunnyslope advocates, by conditioning the sale of the Capstone Loan to First Southern on continued application of the Regulatory Agreement. Instead, it expressly released that agreement. Similarly, the Capstone Loan could have been made subject to the various affordable housing covenants and restrictions related to the Phoenix IDA financing, the City loan, the State loan, and the tax credits, but that is not how the deal was put together. Those provisions were explicitly subordinated to the Capstone Loan. We cannot disregard the terms of the agreements.
Sunnyslope also complains that First Southern should not benefit from knowingly undertaking what Sunnyslope describes as a “high risk/high reward” transaction, a point echoed in the dissenting opinion, at 954. But the same description could be applied to Sunnyslope’s new owners. It is not persuasive for the pot to call the kettle black. There is no reason why Cornerstone should be uniquely immune from the risks that it knowingly undertook.
More importantly, the argument fails to appreciate that First Southern stands in the shoes of the original lender, Capstone or, in practical terms, HUD. Suppose HUD (or Capstone) still owned the loan. As the senior lender, its rights would seem clearly established, and Sunnyslope’s argument that the secured value of HUD’s position should be reduced because of the affordable housing restrictions, based on junior financing expressly subordinated to HUD’s position, would lack force. HUD’s position was fully conveyed to First Southern; there is no claim that HUD held anything back for itself. Similarly, there is no claim that First Southern was not a bona fide purchaser of HUD’s interest, so there is no basis to treat First Southern as having an interest less than the interest HUD would have.
■ The value assigned by the bankruptcy court to First Southern’s secured interest did not accurately reflect the actual value of that interest.[6]
V. Conclusion
Valuing First Southern’s, secured interest as if the affordable housing restrictions *950 related to subordinated positions still applied was not appropriate under section 506(a). As a result, the plan of reorganization confirmed by the bankruptcy court and affirmed by the district court must be set aside. It was based on an improper valuation of First Southern’s interest. We reverse the judgment of the district court and remand for additional proceedings consistent with this opinion.
REVERSED and REMANDED.

. "Under 28 U.S.C. § 158(a), we have jurisdiction to hear appeals from final judgments, order[s] and decrees entered by a district court on appeal from a bankruptcy court.” In re Fowler, 394 F.3d 1208, 1211 (9th Cir.2005) (internal quotation marks omitted). This court may also hear interlocutory appeals based on the flexible finality rule, a judicially created rule unique to bankruptcy. See id. (discussing the flexible finality rule). The parties have disagreed about the applicability of that flexible finality rule in these circumstances, but it is no longer necessary for us to resolve that issue.

. The doctrine of equitable mootness differs from Article III mootness. The latter deals with whether there is an actual, live case or controversy for a court to decide. If there is not, then we lack authority under the Constitution to proceed. In contrast, "equitable mootness” is "a judge-made abstention doctrine” that is based on an unwillingness to alter the outcome of a plan of reorganization in circumstances where it would not be equitable to do so. In re Mortgages, 771 F.3d at 1214-15. As it is a prudential doctrine, it does not present a challenge to our jurisdiction.

. Sunnyslope contends that the aggrieved party is required to appeal a denial of a stay to this court and thereafter to the Circuit Justice, citing In re Roberts Farms, 652 F.2d 793, 798 (9th Cir.1981), But our later decision in Focus Media looked only to see if the party sought a stay from the bankruptcy court and the district court. In Roberts Farms, the party did not even seek a stay from the bankruptcy court, so the question of what further steps beyond that had to be taken was not before the court. 652 F.2d at 798.

. The dissent argues, at 953-55, that our opinion fails to determine value with regard to the fact that Sunnyslope proposes to use the property as an affordable housing complex. But Rash does not authorize the bankruptcy valuation to be based on the income stream that would be derived from the use of property as an affordable housing complex. It holds that “the replacement-value standard accurately gauges the debtor’s 'use' of the property.” 520 U.S. at 963, 117 S.Ct. 1879. Replacement value is a measure of what it would cost to produce or acquire an equivalent piece of property, in that instance “the price the Rashes would have to pay to purchase a like tractor.” Id. at 957, 117 S.Ct. 1879. The seller of the tractor would not be expected to sell it to the Rashes cheaper because the Rashes planned to use it in a way that would not generate much income. Just as the replacement value of a tractor would not take into account the buyer’s anticipated use of the tractor, the replacement value of a 150-unit apartment complex does not take into account the fact that there is a restriction on the use of the complex. Thus, contrary to the dissent's assertion, at 955, that we are using a foreclosure method of valuation, we merely conclude that it was erroneous to factor the restrictive covenants into the replacement value of Sunnyslope.

. In light of our resolution of this issue, it is not necessary for us to consider other arguments made by the parties, including treatment of the tax credits and the appropriate interest rate on payments owed to First Southern under the plan.