**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Debtor.* | No. 12-17241 |
| | D.C. No. 2:11-cv-02579-HRH |
| FIRST SOUTHERN NATIONAL BANK, *Plaintiff-Appellant*, v. SUNNYSLOPE HOUSING LIMITED PARTNERSHIP, *Defendant-Appellee.* | |

IN RE SUNNYSLOPE HOUSING
LIMITED PARTNERSHIP,
*Debtor.*

No. 12-17327

D.C. No.
2:11-cv-02579-HRH

SUNNYSLOPE HOUSING LIMITED
PARTNERSHIP,
*Plaintiff-Appellant*,

v.

FIRST SOUTHERN NATIONAL
BANK,
*Defendant-Appellee.*

IN RE SUNNYSLOPE HOUSING
LIMITED PARTNERSHIP,
*Debtor.*

No. 13-16164

D.C. No.
2:12-cv-02700-HRH

FIRST SOUTHERN NATIONAL
BANK,
*Plaintiff-Appellant*,

v.

SUNNYSLOPE HOUSING LP,
*Defendant-Appellee.*

IN RE SUNNYSLOPE HOUSING
LIMITED PARTNERSHIP,
                    *Debtor.*

SUNNYSLOPE HOUSING LP,
                    *Plaintiff-Appellant*,

v.

FIRST SOUTHERN NATIONAL
BANK,
                    *Defendant-Appellee.*

No. 13-16180

D.C. No.
2:12-cv-02700-HRH

ORDER AND
AMENDED
OPINION

Appeals from the United States District Court
for the District of Arizona
H. Russel Holland, District Judge, Presiding

Argued and Submitted En Banc January 17, 2017
San Francisco, California

Filed May 26, 2017
Amended June 23, 2017

Before:  Sidney R. Thomas, Chief Judge, and Alex
Kozinski, Diarmuid F. O'Scannlain, Susan P. Graber,
Ronald M. Gould, Richard C. Tallman, Carlos T. Bea,
Jacqueline H. Nguyen, Andrew D. Hurwitz, John B.
Owens, and Michelle T. Friedland, Circuit Judges.

Order;
Opinion by Judge Hurwitz;
Dissent by Judge Kozinski

# SUMMARY[*]

## Bankruptcy

The en banc court affirmed the district court's judgment, which affirmed the bankruptcy court's affirmance of a Chapter 11 plan of reorganization, as modified on remand from the district court.

The debtor sought, over a secured creditor's objection, to retain and use the creditor's collateral in the Chapter 11 plan through a "cram down." Pursuant to 11 U.S.C. § 506(a)(1), the creditor's claim was treated as secured "to the extent of the value of such creditor's interest." That value was "determined in light of the purpose of the valuation and of the proposed disposition or use of such property." Under *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), a "replacement-value standard," rather than a "foreclosure-value standard," applies to cram-down valuations.

Here, unlike in a typical case, foreclosure value exceeded replacement value because foreclosure would vitiate covenants requiring that the secured property, an apartment complex, be used for low-income housing. The en banc court nonetheless held that, under *Rash*, § 506(a)(1) required the use of replacement value rather than a hypothetical value derived from the very foreclosure that the reorganization was designed to avoid. Thus, the bankruptcy court did not err in approving the debtor's plan of reorganization and valuing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the collateral assuming its continued use after reorganization as low-income housing.

The en banc court held that the plan of reorganization was fair and equitable, as required by 11 U.S.C. § 1129(b), because the creditor retained its lien and received the present value of its allowed claim over the term of the plan. The secured claim was not undervalued, and the plan provided for payments equal to the present value of the secured claim.

The en banc court held that the bankruptcy court did not abuse its discretion in finding the plan of reorganization feasible.

Finally, the en banc court held that the bankruptcy court did not err in failing to allow the creditor, on remand, to make a second election to have its claim treated as either fully or partially secured under 11 U.S.C. § 1111(b).

Dissenting, Judge Kozinski, joined by Judges O'Scannlain and Friedland, wrote that the majority misinterpreted *Rash*, and the appropriate value of the secured property was the market price of the building without restrictive covenants.

---

**COUNSEL**

Edward K. Poor (argued), Quarles & Brady LLP, Chicago, Illinois; Brian Sirower and Walter J. Ashbrook, Quarles & Brady LLP, Phoenix, Arizona; for Plaintiff-Appellant Plaintiff-Appellant.

Susan M. Freeman (argued), Henk Taylor, and Justin Henderson, Lewis and Roca LLP, Phoenix, Arizona;

Bradley D. Pack, Scott B. Cohen, and David Wm. Engelman, Engelman Berger P.C., Phoenix, Arizona; for Defendant-Appellee Defendant-Appellee.

Donald L. Gaffney and Jasmin Yang, Snell & Wilmer LLP, Phoenix, Arizona, for Amici Curiae Arizona Bankers Association, California Bankers Association, Hawaii Bankers Association, Idaho Banks Association, Montana Bankers Association, and Washington Bankers Association.

## ORDER

The opinion filed May 26, 2017, is amended as follows:

1.   At page 9 of the slip opinion, delete "11 U.S.C. § 1325(a)(5)(B)" and replace it with "11 U.S.C. § 1129(b)(2)(A)."

2.   At page 11 of the slip opinion, delete "Cornerstone at Camelback LLC invested $1.2 million in the complex." and in the next sentence, the word "then."  The amended opinion should state: "After confirmation, First Southern obtained a stay of the plan of reorganization from the district court pending appeal."

3.   At page 11 of the slip opinion, delete the sentence following "First Southern again appealed." and replace it with "The district court denied First Southern's request for a stay.  Cornerstone at Camelback LLC invested $1.2 million in the complex, and the plan was funded.  The district court affirmed the reorganization plan as modified."

**OPINION**

HURWITZ, Circuit Judge:

When a debtor, over a secured creditor's objection, seeks to retain and use the creditor's collateral in a Chapter 11 plan of reorganization through a "cram down," the Bankruptcy Code treats the creditor's claim as secured "to the extent of the value of such creditor's interest." 11 U.S.C § 506(a)(1). That value is to "be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Id.*

In *Associates Commercial Corp. v. Rash*, the Supreme Court adopted a "replacement-value standard" for § 506(a)(1) cram-down valuations. 520 U.S. 953, 956 (1997). The Court held that replacement value, "rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use.'" *Id.* at 963 (quoting *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 75 (1st Cir. 1995)).

In rejecting a "foreclosure-value standard," the Court also noted that foreclosure value was "typically lower" than replacement value. *Id.* at 960. Today, however, we confront the atypical case. Because foreclosure would vitiate covenants requiring that the secured property—an apartment complex—be used for low-income housing, foreclosure value in this case exceeds replacement value, which is tied to the debtor's "actual use" of the property in the proposed reorganization. *Id.* at 963. But we take the Supreme Court at its word and hold, as *Rash* teaches, that § 506(a)(1) requires the use of replacement value rather than a hypothetical value derived from the very foreclosure that the reorganization is designed to avoid. Thus, the bankruptcy court did not err in this case in approving Sunnyslope's plan

of reorganization and valuing the collateral assuming its continued use after reorganization as low-income housing.

## BACKGROUND

### I.  The Sunnyslope Project

Sunnyslope Housing Limited Partnership ("Sunnyslope") owns an apartment complex in Phoenix, Arizona.  Construction funding came from three loans.  Capstone Realty Advisors, LLC, provided the bulk of the funding through an $8.5 million loan with an interest rate of 5.35%, secured by a first-priority deed of trust.  The Capstone loan was guaranteed by the United States Department of Housing and Urban Development ("HUD"), and funded through bonds issued by the Phoenix Industrial Development Authority.  The City of Phoenix and the State of Arizona provided the balance of the funding.  The City loan was secured by a second-position deed of trust, and the State loan by a third-position deed of trust.

#### A.  The Covenants

To secure financing and tax benefits, Sunnyslope entered into five agreements:

1.  To obtain the HUD guarantee, Sunnyslope signed a Regulatory Agreement requiring that the apartment complex be used for affordable housing.

2.  Sunnyslope also entered into a Regulatory Agreement with the Phoenix Industrial Development Authority, requiring Sunnyslope to "preserve the tax-exempt status" of the project, and use 40% of the units for low-income housing.  The agreement provided that its covenants "shall run with the land and shall bind the Owner, and its

successors and assigns and all subsequent owners or operators of the Project or any interest therein." The restrictions, however, terminated on "foreclosure of the lien of the Mortgage or delivery of a deed in lieu of foreclosure."

3. The City of Phoenix required Sunnyslope to sign a Declaration of Affirmative Land Use Restrictive Covenants, mandating that 23 units be set aside for low-income families. The restriction ran with the land and bound "all future owners and operators" but, similarly, would be vitiated by foreclosure.

4. The Arizona Department of Housing required Sunnyslope to enter into a Declaration of Covenants, Conditions, and Restrictions. That 40-year agreement set aside five units for low-income residents. The agreement ran with the land and bound future owners, terminated upon foreclosure, and was expressly subordinate to the HUD Regulatory Agreement.

5. Finally, in order to receive federal tax credits, Sunnyslope agreed with the Arizona Department of Housing to use the entire complex as low-income housing. The tax credits, and restriction on use, would terminate on foreclosure.

## B. The Default and its Aftermath

In 2009, Sunnyslope defaulted on the Capstone loan. As guarantor, HUD took over the loan and sold it to First Southern National Bank ("First Southern") for $5.05 million. In connection with the sale, HUD released its Regulatory Agreement. The Loan Sale Agreement confirmed, however, that the property remained subject to the other "covenants, conditions and restrictions."

First Southern began foreclosure proceedings, and an Arizona state court appointed a receiver. In December 2010, the receiver agreed to sell the complex to a third party for $7.65 million.

## II. The Bankruptcy Proceedings

Before the sale could close, Sunnyslope filed a Chapter 11 petition. Over First Southern's objection, Sunnyslope sought to retain the complex in its proposed plan of reorganization, exercising the "cram-down" option in 11 U.S.C. § 1129(b)(2)(A). A successful cram down allows the reorganized debtor to retain collateral over a secured creditor's objection, subject to the requirement in § 506(a)(1) that the debt be treated as secured "to the extent of the value of such creditor's interest" in the collateral.

The central issue in the reorganization proceedings was the valuation of First Southern's collateral, the apartment complex. Sunnyslope asserted that the complex should be valued as low-income housing, while First Southern contended that the complex should instead be valued without regard to Sunnyslope's contractual obligations to use it as low-income housing, which would terminate upon foreclosure.

In that regard, First Southern's expert valued the complex at $7.74 million, making the "extraordinary assumption" that a foreclosure would remove any low-income housing requirements. First Southern's expert also opined, however, that the value of the property was only $4,885,000 if those requirements remained in place. Sunnyslope's expert valued the property at $2.6 million with the low-income housing restrictions in place, and at $7 million without.

During its original proceeding, the bankruptcy court held that, under § 506(a)(1), the value of the property was $2.6 million because Sunnyslope's plan of reorganization called for continued use of the complex as low-income housing. The court also declined to include in the valuation of the complex the tax credits available to Sunnyslope.   First Southern then elected to treat its claim as fully secured under 11 U.S.C. § 1111(b).

The bankruptcy court subsequently confirmed the plan of reorganization, which provided for payment in full of the First Southern claim over 40 years, at an interest rate of 4.4%, with a balloon payment at the end without interest. The reorganization plan required the City and State to relinquish their liens, but provided for payment of their unsecured claims in full, albeit without interest, at the end of the 40 years.

The bankruptcy court found the plan fair and equitable under 11 U.S.C. § 1129(b)(1) because First Southern retained its lien, would receive an interest rate equivalent to the prevailing market rate, and could foreclose (and, therefore, obtain the property without the restrictive covenants) should Sunnyslope default.  The court also found the plan feasible under 11 U.S.C. § 1129(a)(11), citing Sunnyslope's financial projections, and noting that "the Creditor has come in with no evidence of a lack of feasibility."  The court concluded that it was more likely than not that Sunnyslope could make plan payments based on the history of comparable properties.  The court also noted that, when the balloon payment came due, the property would be free of the low-income housing restrictions, making the collateral an even more valuable asset.

After confirmation, First Southern obtained a stay of the plan of reorganization from the district court pending appeal.

The district court affirmed the bankruptcy court's valuation of the complex with the low-income housing restrictions in place, but held that the tax credits should also have been considered. Both parties appealed.

After First Southern unsuccessfully sought a writ from this court prohibiting the bankruptcy court from considering the district court's remand pending resolution of the appeals, the bankruptcy court valued the tax credits at $1.3 million, added that amount to its previous valuation, and re-confirmed the plan of reorganization. First Southern attempted to withdraw its § 1111(b) election, but the bankruptcy court denied the request.

First Southern again appealed. The district court denied First Southern's request for a stay. Cornerstone at Camelback LLC invested $1.2 million in the complex, and the plan was funded. The district court affirmed the reorganization plan as modified. First Southern timely appealed to this court, and Sunnyslope cross-appealed.

## III.    Panel Opinion

After the various appeals were consolidated, a divided panel of this court reversed the bankruptcy court's order approving the plan of reorganization, holding that the court should have valued the apartment complex without regard to the affordable housing requirements. *In re Sunnyslope Hous. Ltd. P'ship*, 818 F.3d 937, 940 (9th Cir. 2016). The majority held that, under § 506(a)(1), replacement cost "is a measure of what it would cost to produce or acquire an equivalent piece of property" and that "the replacement value of a 150-unit apartment complex does not take into account the fact that there is a restriction on the use of the complex." *Id.* at 948 n.5. The dissenting opinion, in contrast, argued that "a straightforward application" of *Rash*

"compels valuing First Southern's collateral . . . in light of Sunnyslope's proposed use of the property in its plan of reorganization as affordable housing." *Id.* at 950 (Paez, J., dissenting).[1]

A majority of the active judges of this court voted to grant Sunnyslope's petition for rehearing en banc, and the panel opinion was vacated. *In re Sunnyslope Hous. Ltd. P'ship*, 838 F.3d 975 (9th Cir. 2016); *see* Fed. R. App. P. 35.

## DISCUSSION

The critical issue for decision is whether the bankruptcy court erred by valuing the apartment complex assuming its continued use after reorganization as low-income housing. In addition, First Southern contends that the plan of reorganization is neither fair and equitable nor feasible, and that the district court erred in not allowing it to withdraw its § 1111(b) election.

## I.  Valuation

When a Chapter 11 debtor opts for a cram down, a creditor's claim is secured "to the extent of the value of such creditor's interest in the estate's interest in [the secured] property." 11 U.S.C. § 506(a)(1).  The value of that claim is "determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Id.*  We established long ago that, "[w]hen a Chapter 11 debtor or a

---

[1] The panel unanimously rejected Sunnyslope's contention that the appeal was equitably moot because the plan of reorganization had gone into effect during the appeal. *Sunnyslope*, 818 F.3d at 945 (majority); *id.* at 950 n.1 (dissent).  And, because the panel reversed the order approving the reorganization plan on the valuation issue, it pretermitted the other issues raised by the parties. *See id.* at 949 n.6 (majority).

Chapter 13 debtor intends to retain property subject to a lien, the purpose of a valuation under section 506(a) is not to determine the amount the creditor would receive if it hypothetically had to foreclose and sell the collateral." *In re Taffi*, 96 F.3d 1190, 1192 (9th Cir. 1996) (en banc). The debtor is "in, not outside of, bankruptcy," so "[t]he foreclosure value is not relevant" because the creditor "is not foreclosing." *Id.*

In *Taffi*, we noted that our decision was consistent with the approach of all but one circuit—the Fifth—which had adopted a foreclosure-value standard in *In re Rash*, 90 F.3d 1036 (5th Cir. 1996) (en banc). *See* 96 F.3d at 1193. There, the Rashes owed $41,171 on a freight-hauler truck loan when they filed a Chapter 13 petition. *Rash*, 520 U.S. at 956. They sought to retain the truck through a cram down, proposing a reorganization plan paying the creditor for the foreclosure value of the truck, which they contended was $28,500. *Id.* at 957. In contrast, the creditor argued the truck should be valued at "the price the Rashes would have to pay to purchase a like vehicle," estimated at $41,000. *Id.* But the Fifth Circuit disagreed and held that § 506(a)(1) required the use of foreclosure value. *Rash*, 90 F.3d at 1060–61.

One year after we decided *Taffi*, the Supreme Court reversed the Fifth Circuit. The Court held, consistent with *Taffi*, that "§ 506(a) directs application of the replacement-value standard," rather than foreclosure value. *Rash*, 520 U.S. at 956.[2] The Court stated that the value of collateral under § 506(a)(1) is "the cost the debtor would

---

[2] *Rash* used the term "replacement" value, but noted that the term is consistent with the "fair-market" valuation nomenclature that we used in *Taffi*. *Rash*, 520 U.S. at 959 n.2.

incur to obtain a like asset for the same 'proposed . . . use.'" *Id.* at 965 (alteration in original).

*Rash* stressed the instruction in § 506(a)(1) to value the collateral based on its "proposed disposition or use" in the plan of reorganization. *Id.* at 962. The Court emphasized that, in a reorganization involving a cram down, the debtor will continue to use the collateral, and valuation must therefore occur "in light of the proposed repayment plan reality: no foreclosure sale." *Id.* at 963 (alteration omitted) (quoting *Winthrop Old Farm Nurseries*, 50 F.3d at 75). The "actual use," the Court held, "is the proper guide," *id.*, and replacement value is therefore "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller," *id.* at 960.

*Rash* also teaches that the determination of replacement value by the bankruptcy court is a factual finding. *Id.* at 965 n.6. We therefore review the valuation determination in this case for clear error. *In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010). We find none.

The essential inquiry under *Rash* is to determine the price that a debtor in Sunnyslope's position would pay to obtain an asset like the collateral for the particular use proposed in the plan of reorganization. 520 U.S. at 965. First Southern does not dispute that there was substantial evidence before the bankruptcy court that it would cost Sunnyslope $3.9 million to acquire a property like the apartment complex (including the tax-credits) with similar restrictive covenants requiring that it be devoted to low-income housing.

Despite this, First Southern argues that the property should instead be valued at its "highest and best use"— housing without any low-income restrictions. But

§ 506(a)(1) speaks expressly of the reorganization plan's "proposed disposition or use." Absent foreclosure, the very event that the Chapter 11 plan sought to avoid, Sunnyslope cannot use the property except as affordable housing, nor could anyone else. *Rash* expressly instructs that a § 506(a)(1) valuation cannot consider what would happen after a hypothetical foreclosure—the valuation must instead reflect the property's "actual use." 520 U.S. at 963.

First Southern attempts to distinguish *Rash* by noting that foreclosure value is greater than replacement value in this case. But *Rash* implicitly acknowledged that this outcome might occasionally be the case, and nonetheless adopted a replacement-value standard. *See* 520 U.S. at 960. We cannot depart from that standard without doing precisely what *Rash* instructed bankruptcy courts to avoid—assuming a foreclosure that the Chapter 11 petition prevented. *See id.* at 963.

To be sure, a creditor is better off whenever the highest possible value for its collateral is chosen, and *Rash* did in fact recognize that when "a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use." *Id.* at 962. But *Rash* did not adopt a rule requiring that the bankruptcy court value the collateral at the higher of its foreclosure value or replacement value. Rather, it expressly rejected the use of foreclosure value, and instead stressed the requirement in § 506(a)(1) that the property be valued in light of its "proposed disposition or use." 520 U.S. at 960, 962. Here, the proposed disposition and use is for low-income housing; indeed, no other use is possible without foreclosure. First Southern may be exposed

to an increased risk under the cram down, but that does not allow us to ignore the command of *Rash*.

First Southern also argues that the low-income housing requirements do not apply to its security because HUD released its Regulatory Agreement, and all other covenants are junior to its lien. Although the State and City liens may be subordinate to First Southern's, it is undisputed the restrictions they impose continue to run with the land absent foreclosure. Thus, they were properly considered in determining the value of the collateral.

Finally, First Southern's amici argue that valuing the collateral with the low-income restrictions in place would discourage future lending on like projects. We disagree. "[W]hile the protection of creditors' interests is an important purpose under Chapter 11, the Supreme Court has made clear that successful debtor reorganization and maximization of the value of the estate are the primary purposes." *In re Bonner Mall P'ship*, 2 F.3d 899, 916 (9th Cir. 1993) (footnote omitted), *abrogated on other grounds by Bullard v. Blue Hills Bank*, 135 S. Ct. 1686 (2015). Allowing the debtor to "rehabilitate the business" generally maximizes the value of the estate. *Id.* And, in this case, First Southern bought the Sunnyslope loan at a substantial discount, knowing of the risk that the property would remain subject to the low-income housing requirements. Valuing First Southern's collateral with those restrictions in mind subjects the lender to no more risk than it consciously undertook. *See Rash*, 520 U.S. at 962–63.

Accordingly, we hold that the bankruptcy court did not err in valuing First Southern's collateral in the plan of

reorganization assuming its continued use as affordable housing.[3]

## II. Plan Fairness

The cram-down provision in 11 U.S.C. § 1129(b) requires that the reorganization plan be "fair and equitable." The secured creditor must retain its lien, § 1129(b)(2)(A)(i)(I), and receive payments over time equaling the present value of the secured claim, § 1129(b)(2)(A)(i)(II). Whether a plan is fair and equitable is a factual determination reviewed for clear error. *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir. 1986).

The bankruptcy court found the Sunnyslope plan fair and equitable because First Southern retained its lien and received the present value of its allowed claim over the term of the plan. There is no dispute that First Southern retained its lien, and our discussion above disposes of any contention that its secured claim was undervalued. Thus, the only remaining question is whether the bankruptcy court erred in concluding that the plan provides for payments equal to the present value of the secured claim.

---

[3] The dissent correctly notes the statement in *Rash* that "[w]hether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property." 520 U.S. at 965 n.6. But the very footnote in which that language appears stresses "that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases." *Id*. Given the Court's plain injunction that "actual use, not a foreclosure sale that will not take place, is the proper guide" to determining replacement value, *id*. at 963, a bankruptcy court surely cannot premise a § 506(a) valuation on a hypothetical foreclosure. And, First Southern had no ability to sell the property free and clear of the low-income restrictions absent such a foreclosure.

The interest rate chosen must ensure that the creditor receives the present value of its secured claim through the payments contemplated by the plan of reorganization. *Till v. SCS Credit Corp.*, 541 U.S. 465, 469 (2004). In *Till*, a plurality endorsed the "formula approach" for calculating the appropriate interest rate, which begins with the national prime rate and adjusts up or down according to the risk of the plan's success. *Id.* at 478–79. The creditor bears the burden of showing that the prime rate does not adequately account for the riskiness of the debtor. *Id.*

First Southern argues that it is not receiving the present value of its secured claim because the interest rate adopted in the plan, 4.4%, is lower than the original rate on its loan. But we find no clear error in the bankruptcy court's determination. The bankruptcy court conducted a hearing at which it heard expert testimony, applied the *Till* test, and found that the 4.4% interest rate on the plan payments would result in First Southern's receiving the present value of its $3.9 million security over the term of the reorganization plan. The relevant national prime rate was 3.25%, and the bankruptcy court adjusted that rate upward to account for the risk of non-payment. The court also heard testimony that the market loan rate for similar properties was 4.18%. In setting the 4.4% rate, the bankruptcy court carefully explained its reasoning, noting that interest rates had decreased significantly since the Capstone loan was made. The bankruptcy court also noted that the risk to the lender had similarly decreased since then because, when the loan was made, the apartment complex had not yet been built.[4]

---

[4] First Southern contends that the bankruptcy court erred by considering the chance of a second default as a credit enhancement. But if Sunnyslope defaults a second time, First Southern can foreclose and

The bankruptcy court did not clearly err, and we affirm its determination.

## III.    Plan Feasibility

Plan confirmation also requires a finding that the debtor will not require further reorganization.    11 U.S.C. § 1129(a)(11).    It therefore requires the debtor to demonstrate that the plan "has a reasonable probability of success." *Acequia*, 787 F.2d at 1364.  A bankruptcy court's finding of feasibility is reviewed for abuse of discretion. *Id.* at 1365.

The bankruptcy court did not abuse its discretion in finding the Sunnyslope plan feasible.  A projection showed that Sunnyslope would be able to make plan payments, and expert testimony confirmed that the collateral would remain useful for 40 years (the term of the plan).  The court also found the balloon payment feasible because it was secured by property whose value exceeded the value of the remaining First Southern claim.  And the court noted that First Southern had "come in with no evidence of a lack of feasibility."  It was therefore well within the bankruptcy court's discretion to find that the plan of reorganization was feasible.

## IV.    The § 1111(b) Election

Finally, § 1111(b) of the Bankruptcy Code allows a secured creditor to elect to have its claim treated as either fully or partially secured.  An election affects the treatment of the unsecured portion of the claim under the plan and the

---

obtain a property worth more than the court's § 506(a)(1) valuation. *See Till*, 541 U.S. at 479 (noting that risk can be evaluated in light of "the nature of the security").

procedural protections afforded to the creditor. *See, e.g.*, 11 U.S.C. § 1129(a)(7)(B). In the absence of a contrary order by the bankruptcy court, the creditor must make this election before the end of the disclosure statement hearing. Fed. R. Bankr. P. 3014.

In this case, the bankruptcy court ordered that First Southern make its § 1111(b) election "7 calendar days after the court issues a ruling on valuation." First Southern timely did so, choosing to treat its entire claim as secured.

First Southern now argues that the bankruptcy court erred in not allowing it to make a second election after the district court remanded and required the tax credits be added to the valuation. In effect, First Southern contends that the bankruptcy court erred by not amending its scheduling order to allow the creditor a second bite at the apple. A bankruptcy court may modify a scheduling order "for cause," Fed. R. Bankr. P. 9006(b)(1), and we review its decision whether to do so for abuse of discretion, *see In re Zilog, Inc.*, 450 F.3d 996, 1006–07 (9th Cir. 2006). We assume without deciding that a court should modify a scheduling order to allow a creditor to change its § 1111(b) election after a material alteration to the original plan. *See In re Scarsdale Realty Partners, L.P.*, 232 B.R. 300, 300 (Bankr. S.D.N.Y. 1999); *see also In re Keller*, 47 B.R. 725, 730 (Bankr. N.D. Iowa 1985). But, in this case, we agree with the district court that the only alteration in the plan—the increased valuation of the collateral—was not material to the election decision.

When First Southern made its election, the plan provided for 40 years of payments of principal and interest providing the creditor with the present value of its $2.6 million secured claim, with a final balloon payment covering the remainder of the debt. After remand, as the district court noted, "First Southern's treatment under the plan as modified remains the

same; the only difference is that its annual payments will be more and the balloon payment at the end of the 40 years will be less."

Significantly, the amended plan of reorganization did not alter the treatment of unsecured claims, which are to be paid without interest in 40 years, or immediately at five cents on the dollar. Thus, First Southern knew at the time of the initial election "the prospects of its treatment under the plan," *Keller*, 47 B.R. at 729 (quoting Fed. R. Bankr. P. 3014 advisory committee note), yet it opted to treat its entire claim as secured.

Allowing a second election would give First Southern a second chance to object to the plan, this time both as a secured and unsecured creditor and, given the potential size of the unsecured claim, the ability to prevent approval of the reorganization plan. *See* 11 U.S.C. § 1129(a)(7)(A)(ii). But this is precisely the option First Southern had at the time of its first election, when it chose to forgo having any portion of its claim treated as unsecured, instead seeking to increase the valuation of its secured claim through appeal. That gambit failed, and the bankruptcy court did not err when it rejected First Southern's attempt to turn back the clock and torpedo the plan of reorganization.

## CONCLUSION

We **AFFIRM** the judgment of the district court.[5]

---

[5] Sunnyslope's cross-appeal argues that the tax credits should not have been included in the valuation of the security. At oral argument,

KOZINSKI, Circuit Judge, with whom Circuit Judges O'SCANNLAIN and FRIEDLAND join, dissenting:

Today's opinion claims to "take the Supreme Court at its word," but it fetishizes a selection of the Court's words at the expense of its logic. This cramped formalism produces a strange result: Even though the Court has told us that cramdown valuations are supposed to limit a secured creditor's risk, we've adopted a new valuation standard that turns entirely on the debtor's desires—creditors be damned. Instead of holding the valuation hostage to the debtor's "particular use," I would hold that the appropriate value is the market price of the building without restrictive covenants.[1]

The majority purports to rely on *Associates Commercial Corp.* v. *Rash*, 520 U.S. 953 (1997), but *Rash* never adopted today's strict "particular use" interpretation of replacement value. The Court was more flexible: "Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the

---

counsel for Sunnyslope stated that this argument would be withdrawn if the bankruptcy court's valuation were otherwise affirmed. Given our conclusions above, we do not address the tax credit issue. In the exercise of our discretion, we also decline to address Sunnyslope's argument that the appeal is equitably moot. *See In re Transwest Resort Props., Inc.*, 801 F.3d 1161, 1167 (9th Cir. 2015) (noting that "[e]quitable mootness is a prudential doctrine").

[1] In this case, the price a buyer would have to pay on the market for like property may be closely approximated by "foreclosure value." That coincidence drives the majority's analysis, but it does nothing to answer the real question presented by this case: Whether the market valuation commanded by *Rash* turns on a debtor's idiosyncratic use of the particular property. It does not.

nature of the property." *Id.* at 965 n.6. After all, the bare notion of "replacement value" isn't self-interpreting. A conservation-minded owner may prefer to see his lands stay wild. He may adopt an easement to keep them that way, and may not care that this drastically reduces the commercial value of the property. But the owner's preferences don't shape the market value of an undeveloped acre—which is what the owner who actually *did* buy new replacement property would have to pay.

What interpretation of "replacement value" should we use? Unhelpfully, *Rash* offers few specifics on how the nature of the property and the debtor should affect valuation.[2] But *Rash* expressly notes that replacement value shouldn't include certain warranties and modifications that drive a wedge between private value and market value. *See id.* And *Rash* was unambiguously motivated by a desire to reduce what it saw as the "double risks" that cramdowns pose for creditors: "The debtor may again default and the property may deteriorate from extended use." *Id.* at 962. With these risks in mind, the *Rash* Court adopted a broad standard—the typically higher replacement value over the typically lower foreclosure value—that would give secured creditors their due protection. *See also Till* v. *SCS Credit Corp.*, 541 U.S. 465, 489 (2004) (Thomas, J., concurring) (noting that creditors are "compensated in part for the risk of

---

[2] The fact that *Rash* does not adopt a strict definition of "replacement value" and offers little guidance on how to apply it has been widely appreciated by other courts and commentators. *See, e.g.*, Charles Jordan Tabb, *Law of Bankruptcy* 741 (4th ed. 2016) (describing footnote 6 of *Rash* as a "substantial opening" that has allowed a wide variety of valuation standards to flourish). I make no effort to defend *Rash*, which has been subject to abundant criticism along these lines. But I also see no reason to step beyond it, as today's majority does.

nonpayment through the valuation of the secured claim" because *Rash* used a "secured-creditor-friendly replacement-value standard rather than the lower foreclosure-value standard"). A moment's reflection reveals why today's holding is at odds with these motivations: The majority's valuation falls well below what the secured creditor would obtain from an immediate sale.[3]

In short, the majority has adopted a test that is not dictated by the letter of *Rash* and is contradicted by its reasoning. For these reasons, and those offered by Judge Clifton in his panel opinion, *In re Sunnyslope Hous. Ltd. P'ship*, 818 F.3d 937 (9th Cir. 2016), I dissent.

---

[3] In my view, much of this risk will be passed on to borrowers in the form of higher interest rates—in which case, the joke's on future Sunnyslopes. Regardless, the Supreme Court expressly held that "[a]djustments in the interest rate and secured creditor demands for more 'adequate protection' do not fully offset" the risks of cramdowns. 520 U.S. at 962–63 (quoting 11 U.S.C. § 361). Of course, one reason for ex-post credit risk might be *Rash* itself: It's hard for parties to bargain in the shadow of an unclear rule.